## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JOHN and JANE DOE,

  *Plaintiffs*,

v.

GLORIA DENT, DAWN PULLIAM,
ROBERT SILKWORTH, ERICA
McFARLAND, SARAH J. McDERMOTT,
DANA SCHALLHEIM, JOANNE BACHE
TOBIN, and S.H., in their official capacities
as members of the Anne Arundel County
Board of Education; DR. MARK T.
BEDELL, in his individual capacity and in his
official capacity as Superintendent of Anne
Arundel County Public Schools;
KATHERINE SMITH, in her individual
capacity and in her official capacity as
Principal of Broadneck High School; and
PHILIP CASOLO, in his individual capacity
and in his official capacity as Assistant
Principal of Broadneck High School,

  *Defendants*.

Case No. 1:26-cv-02690-RDB

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs John and Jane Doe (collectively, "the Does") bring this First Amended Complaint[1] under the First and Fourteenth Amendment, *see* 42 U.S.C. §1983, against Defendants and allege as follows:

---

[1] Plaintiffs file this complaint using pseudonyms to protect the identity of their minor child and to protect themselves from the threat of harassment and violence that public participation in this case would invite. These issues are addressed more fully in their amended motion for leave to proceed under pseudonym, which they intend to file forthwith.

**INTRODUCTION**

1.    Just four months ago, in *Mirabelli v. Bonta*, the Supreme Court confirmed what should be common sense: Parents have the right "to direct the upbringing and education of their children," including on matters of "sex and gender," and public schools cannot undermine that right by "transitioning" a child's gender and then hiding that fact from the parents. 607 U.S. 492, 496–98 (2026).

2.    Indeed, nearly a century of Supreme Court precedent confirms that "the custody, care, and control" of "children" resides "'first in the parents,'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000), especially where "religious beliefs" and "practices" are involved, *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2026), and parents do not abandon those rights at the schoolhouse gate, *id.* at 545, 547.

3.    Policies that provide for the "unconsented facilitation of a child's gender transition" and exclude parents from "participation in decisions regarding their children's mental health" thus violate parents' free exercise rights under the First Amendment and the right to direct the upbringing of their children under the Fourteenth Amendment. *Id.* at 496–97.

4.    Anne Arundel County Public Schools, however, is flouting both fundamental rights. The school district maintains policies that direct school staff to support and facilitate a student's social gender transition at school without requiring parental notice or consent. Among other things, the policies instruct staff to use a student's "preferred name and pronoun." They require schools to allow students to use opposite-sex facilities like bathrooms, locker rooms, and showers. And they allow students to participate in sex-separated activities like sports based on their self-professed gender identity rather than their biological sex.

5.      AACPS's policies do all of this without requiring schools to secure parental consent or even notify parents that the school is transitioning their child's gender. And the policies provide no way for parents to opt out or prevent the school from transitioning their child. Worse still, AACPS uses these policies to justify not only concealing a child's social transition from parents, but also making false statements to parents about that school-facilitated transition.

6.      Plaintiffs John and Jane Doe have a daughter, Mary, who attends an AACPS high school. The Does want to educate Mary according to their religious beliefs that God creates each person as male or female, that sex is based on biology rather than internal self-perception, and that sex cannot be altered. Moreover, the Does want to control how decisions are made for Mary concerning these fundamentally important issues. Under AACPS's policies, however, the Does are deprived of any meaningful ability to direct or influence how AACPS staff refer to or treat Mary while she is at school.

7.      Indeed, AACPS staff have relied on their policies to facilitate Mary's social gender transition behind the Does' backs. Multiple AACPS personnel have referred to Mary using a male name at school and in school documents without informing the Does or securing their consent. When confronted by the Does about this conduct, AACPS personnel first tried to lie and then, when that didn't work, insisted that their actions complied with AACPS policy. AACPS personnel have rebuffed the Does' demands that school staff cease referring to their daughter with a male name and have denied the Does' repeated requests for additional information about their daughter's status. As a result, the Does do not know if AACPS personnel have taken additional steps, like allowing their daughter to access bathrooms and locker rooms with biological boys, without their consent.

8.      This deliberate pattern of concealment and dishonesty deprives the Does of their fundamental right to make decisions concerning the care, custody, and upbringing of their child, and denies them the information necessary to exercise that right in an informed and meaningful way. It also frustrates their ability to direct Mary's religious development.

9.      AACPS's policies and actions violate federal law. The policies should be declared unconstitutional, and Defendants should be enjoined from enforcing them.

**PARTIES**

10.     Plaintiffs John and Jane Doe are and were, at all times mentioned herein, residents of Anne Arundel County, Maryland. Plaintiffs' daughter, Mary, is a minor currently enrolled at Broadneck High School, an AACPS high school. Mary will continue attending Broadneck High School next year.

11.     Anne Arundel County Public Schools is a public school system in the state of Maryland. AACPS comprises 130 schools serving approximately 84,000 students in Anne Arundel County, Maryland.

12.     Defendants Gloria Dent, Dawn Pulliam, Robert Silkworth, Erica McFarland, Sarah J. McDermott, Dana Schallherim, Joanne Bache Tobin, and S.H.[2] are members of the Anne Arundel County Board of Education. The School Board is the public body that governs AACPS. The School Board Defendants are sued in their official capacities.

13.     Defendant Dr. Mark T. Bedell is and was, at all times mentioned herein, the Superintendent of AACPS acting under color of state law. As superintendent, Defendant Bedell "advises the Board of Education on educational policies of the school … and any question under

---

[2] Federal Rule of Civil Procedure 5.2(a)(3) instructs filing parties to refer to "an individual known to be a minor" using "the minor's initials." Defendant "S.H." is the "student member" of the Anne Arundel County Board of Education. Accordingly, Plaintiffs refer to S.H. using her initials.

consideration by the Board." Defendant Bedell manages "all aspects of the operations of AACPS, and is responsible for day-to-day operations and management of the public schools." Defendant Bedell "implements" AACPS policies and practices, including the challenged policies and practices set forth in this Complaint. Defendant Bedell is sued in his individual capacity and in his official capacity as Superintendent of AACPS.

14. Defendant Katherine Smith is and was, at all times mentioned herein, the Principal of Broadneck High School. As principal, Defendant Smith "manages all aspects of [Broadneck High School's] instructional program and operations." Defendant Smith is "[r]esponsible for implementing at the local school level the instructional programs, policies, rules, regulations, guidelines, procedures, and agreements established by the Board and AACPS," and is the "[i]mmediate supervis[or] . . . of all local school employees." Defendant Smith is "the person primarily responsible for the health, safety, and welfare of every student within the school during school hours and while engaged in any activity which is sponsored by the school." Defendant Smith is sued in her individual capacity and in her official capacity as Principal of Broadneck High School.

15. Defendant Philip Casolo is and was, at all times mentioned herein, an Assistant Principal of Broadneck High School. As assistant principal, Defendant Casolo assists the principal in managing school operations, implementing AACPS policies, and supervising school staff. Defendant Casolo is sued in his individual capacity and in his official capacity as Assistant Principal of Broadneck High School.

## JURISDICTION AND VENUE

16. This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

17. The Court has subject-matter jurisdiction over the federal constitutional claims pursuant to 28 U.S.C. §§1331 and 1343(a)(3).

18. This Court has the authority to award damages pursuant to 28 U.S.C. §1343, as well as costs and attorneys' fees under 42 U.S.C. §1988.

19. Venue is proper under 28 U.S.C. §1931 because the acts supporting this Complaint took place in this district and because Defendants reside in and/or have their principal place of business in this district.

**FACTS**

**I. The Shifting Medical Landscape on Gender Dysphoria**

20. There is an ongoing debate in the United States over sex, gender, and how to care for individuals, specifically children, who suffer from gender dysphoria.

21. One often discussed intervention for gender dysphoria is "social transition," which can include using a new, preferred name or pronouns, adopting different clothing and grooming habits, and using facilities and participating in activities according to a new identified gender.

22. Social transition is "'one of the most difficult psychological changes a person can experience.'" *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1208 (S.D. Cal. 2023). And it has an often irrevocable impact on a child's self-perception. Indeed, while the vast majority of children "with gender dysphoria grow out of it," *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1268 (11th Cir. 2024) (Lagoa, J., concurring), most children who are socially transitioned do not. In one study, for example, "93% of those who socially transitioned between three and 12 years old continued to identify as transgender" five years later. *Independent Review of Gender Identity Services for Children and Young People*, The Cass Review, at 162 (Apr. 2024), perma.cc/74EA-L76V. Even those who support socially transitioning children agree that the practice is "not a

neutral decision." *Position Statement on Treatment of Transgender (Trans) and Gender Diverse Youth*, Am. Psychiatric Ass'n (July 2020), perma.cc/KQR4-5JP9.

23.     Social transitioning also makes children more likely to pursue increasingly invasive "treatments," like cross-sex hormones, puberty blockers, and surgeries down the line. *See* Benjamin E. de Mayo et al., *Stability and Change in Gender Identity and Sexual Orientation Across Childhood and Adolescence*, 90 Monographs Soc'y for Rsch. Child Dev. 7, 39–40 (2025), bit.ly/45kQTC2. Those "treatments" can have lasting harmful effects, including loss of bone density, impaired brain development, increased cardiovascular risk, and loss of fertility. *See United States v. Skrmetti*, 605 U.S. 495, 532–36 (2025) (Thomas, J., concurring).

24.     "[T]here is no medical consensus on how best to treat gender dysphoria in children." *Id.* at 530. To the contrary, gender dysphoria treatments "are subject to a rapidly evolving debate that demonstrates a lack of medical consensus over their risks and benefits." *Id.* at 532. Indeed, major scientific associations have recently flipped their positions and come out against certain interventions for children under eighteen. *See* Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*, N.Y. Times (Feb. 4, 2026), archive.ph/r0VXk (noting the American Society of Plastic Surgeons and American Medical Association endorse age limits on gender-related surgery).

## II.    Schools Across the Country Override Parents on Gender-Identity Decisions

25.     "[T]he interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). A child is "not the mere creature of the state," *Pierce v. Soc'y of Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925), and the "righ[t] … to raise one's children ha[s] been deemed 'essential'" and one of the "'basic civil rights of man,'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). These parental rights are rooted

in the "historica[l]" recognition "that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (citing 1 W. Blackstone, Commentaries *447; 2 J. Kent, Commentaries on American Law *190).

26.     Thus, it is long established that "parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli*, 607 U.S. at 497. This right "presumptively includes counseling [children] on important decisions." *H.L. v. Matheson*, 450 U.S. 398, 410 (1981).

27.     The right "to decide what is best for the child" is especially strong in areas like children's "need for medical care or treatment." *Parham*, 442 U.S. at 603–04; *Mirabelli*, 607 U.S. at 497. It is also particularly strong in cases involving "fundamental values" and "intimate decision[s]." *Arnold v. Bd. of Educ. of Escambia County*, 880 F.2d 305, 313 (11th Cir. 1989). And it includes the right to direct the religious upbringing of children. *See Mahmoud*, 606 U.S. at 546–47 ("At its heart, the Free Exercise Clause of the First Amendment protects … [t]he practice of educating one's children in one's religious beliefs."). Parents are presumed to be fit to make decisions for their children on these matters. *Parham*, 442 U.S. at 602–03. And they are not required to surrender their child to "influences" they "find inimical to their religious beliefs or the values they wish instilled in their children." *Arnold*, 880 F.2d at 313.

28.     Parents do not abandon the right to make decisions for their children when they send them to a public school. *See Mahmoud*, 606 U.S. at 545, 547 (2026); *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 202 (2021) (Alito, J., concurring). Even in school, "[i]t is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000); *see id.* ("Public schools must not forget that '*in loco parentis*' does not mean displace

parents."). When school policies conflict with a parent's desires regarding their child's medical care or religious instruction, the parent must be allowed to opt their child out of those practices. *See Mirabelli*, 607 U.S. at 497; *Wisconsin v. Yoder*, 406 U.S. 205, 211 (1972) (Parents are entitled to remove their children from "an environment hostile to [their] beliefs.").

29.    A child's gender confusion implicates the most fundamental aspects of their upbringing, including religion, medical care, mental health, and more. Yet, despite "extensive precedent" that parents must be involved in such decisions, *Troxel*, 530 U.S. at 66 (listing cases), and an on-point Supreme Court decision holding that the "unconsented facilitation of a child's gender transition" violates a parent's free exercise and due process rights, *Mirabelli*, 607 U.S. at 496–97, school districts across the country have adopted policies that exclude parents from decision-making when gender identity is involved, *see List of School District Transgender – Gender Nonconforming Student Policies*, Defending Education (updated June 29, 2026), perma.cc/74PM-PTJX.

30.    Under these policies, schools require staff to facilitate and affirm a student's transition to a new gender without parental knowledge or consent. Often, policies encourage or require staff to deliberately conceal their actions from a student's parents.

31.    Recent examples highlight the harm that these policies can inflict on children and their parents. Indeed, in many cases, parents learn about years-long efforts to facilitate and conceal their child's transition only after the child has been the victim of bullying or suffered a mental health emergency like attempted suicide. And in all cases, these policies drive a wedge between children and their parents.

32.    In *Mirabelli*, for example, one California school hid a child's social transition from parents for over a year. *See* 607 U.S. at 493–94. The parents only learned about it after the child

9

attempted suicide and was hospitalized involuntarily because she was at risk for self-harm. *Id.* Even then, the school continued using the child's preferred name and pronouns, despite her parents' objections. *Id.*

33.    Another California school affirmatively hid a student's transition from his parents, despite the parents' "proactive involvement" in the student's life, and the fact that the parents had voiced their concerns that his diagnosed depression and potential autism made him "particularly vulnerable to social contagion related to gender identity." Kathianne Boniello, *California couple sues LA schools for trans 'secrecy policy' after teen's suicide: 'Social contagion'*, N.Y. Post (Mar. 14, 2026), perma.cc/VJP3-MD4T. Instead of allowing the parents, who were "not transphobic," but "kn[e]w [their] son better than anyone" and were "worr[ied] about his mental health," the school ignored their messages and praised his transition. *Id.* This "destroyed" the family, making the student "withdrawn, oppositional, and distrustful" of his parents, and he eventually committed suicide. *Id.*

34.    A family in Ohio faced similarly "troubling" treatment. *Kaltenbach v. Hilliard City Schools*, 2025 WL 1147577, at *1 (6th Cir. Mar. 27, 2025) (Thapar, J., concurring). When an eighth-grade girl began suffering mental health difficulties, her teachers decided—without consulting her parents—that they would treat her as a male, "'convinced [her] she was a boy in a girl's body,'" and had her "'adopt a new name and identity.'" *Id.* at *2. Because they considered her parents insufficiently "supportive," school officials "treated [her] as a girl whenever she was around her parents, hoping to hide . . . the new identity [they] had concocted for her." *Id.* The parents only discovered the deception when the school accidentally mailed the student a postcard using the male name. *Id.* Their daughter, too, attempted suicide. *Id.*

35. In Florida, school officials socially transitioned a 12-year-old elementary school girl for months, treating her as a boy. *See* MTD Opp. at 1-2, *Perez v. Broskie*, No. 3-22-cv-00083 (M.D. Fla. Apr. 4, 2022), ECF No. 30. A school counselor assured the 12-year-old that the school would not notify her parents. *Id.* at 2. But the school did not maintain the same confidentiality with her peers, who bullied her when they learned of her transition. *Id.* at 3. Still, her parents were not informed. *Id.* In fact, the parents learned of their daughter's situation only after she attempted suicide at school — *twice*. *Id.* at 2. When the parents subsequently confronted school officials, they were told that the school had deliberately concealed their daughter's transition because of the family's Catholic faith. *Id.*

36. The list of examples goes on. *See, e.g.*, Katie Barker, *When Students Change Gender Identity, and Parents Don't Know*, N.Y. Times (June 26, 2024), archive.ph/ggRFi. Over and over, parents are being left in the dark when it comes to crucial decisions about their children. Parental exclusion policies take parents—the ones who have the most comprehensive understanding of their own children—out of the equation and substitute the state as the decision-maker. And when parents are kept in the dark, they can't provide the emotional support or secure the medical care that their children need. *See Kaltenbach*, 2025 WL 1147577, at *2 (Thapar, J., concurring) (schools, through "deception," "stri[p] them of that possibility").

### III.   AACPS Policies Facilitate Social Transition without Parental Consent

37. The School Board has final policymaking and decision-making authority over rules, regulations, and decisions governing AACPS personnel. In coordination with the School Board, Superintendent Bedell provides leadership and direction in planning, coordinating, and evaluating all aspects of AACPS operations, and is responsible for the day-to-day management of the public schools. One of the AACPS Superintendent's core responsibilities is to implement School Board policies, including through the development of regulations. School administrators,

like Principal Smith and Assistant Principal Casolo at Broadneck High School, are likewise responsible for managing the day-to-day operation of their schools and implementing Board policies in their schools.

38.    Starting in 2019, AACPS adopted a series of policies designed to facilitate students' gender transition and conceal that information from parents who object.

**A.    The Guidance Document**

39.    On July 1, 2019, AACPS published a document entitled "Students and Gender Identity: Guidelines for Support."

40.    The Guidance Document purports to "provid[e] information and guidance to students, parents, and school staff on the rights, responsibilities, and best educational practices with regard to *gender identity* and student support in [AACPS]."

41.    The Guidance Document defines "Gender Transition" as:

The process by which a person goes from living and/or identifying as one gender to living and/or identifying as another. Some people may personally identify as a different gender but may not seek to change their public life. For most young people, the experience of gender transition involves no medical intervention.

The document notes that "most transgender youth will undergo gender transition through a process commonly referred to as 'social transition,' whereby they begin to live and identify as the gender consistent with their gender identity."

42.    The Guidance Document directs staff to facilitate students' social transitions at both the primary school and secondary school levels. It instructs staff to "addres[s]" students by the "name and pronoun that match the student's gender identity," and it requires school principals to specifically "communicate with appropriate staff about students who wish to be addressed by a specific name or pronoun."

43. The Guidance Document also instructs staff to "enforce dress codes" according to gender identity rather than biological sex. "Students shall have the right to dress in accordance with their *gender identity*."

44. The Guidance Document further directs staff to allow students to use school "facilities" that match their self-professed gender identity rather than their biological sex. This includes allowing students to "access" and "use" the "restrooms" and "locker rooms of the gender with which they identify." When students attend "overnight field trips and camps," they again "shall have access to facilities that correspond to their *gender identity*" rather than their biological sex. Notably, if another student is "uncomfortable sharing a common area" or intimate facility with a classmate of the other biological sex who identifies as transgender, *that student* is required to move to an "alternative" space.

45. Finally, the Guidance Document requires that "[a]ll students" be allowed "to participate in physical education classes and intramural sports in a manner aligned with their *gender identity*." It also contemplates allowing students to participate "in interscholastic athletics" according to their gender identity where athletic association guidelines allow such participation.

46. Crucially, the Guidance Document goes a step further to conceal gender identity information from parents of high school students. It empowers staff to implement all of these so-called gender-affirming practices without any input from or consultation with a student's parents. The document does not, for example, require school staff to confirm a student's gender identity with parents. Instead, it states that "[t]he person best situated to determine a student's *gender identity* is the student." Staff are permitted to ask for evidence of a student's self-professed gender identity "[o]nly if there is an objective basis that justifies questioning whether a student's *gender*

*identity* or expression is genuine." "A court-ordered name or gender change is not required, and the student is not required to change the student's official school records."

47.     In fact, the Guidance Document expressly contemplates withholding information about a student's transition from parents. According to the document, at the elementary and middle school levels, "it is not unusual for a student's desire to transition to surface at school." In such cases, the document states, it "may" or may not "be appropriate" to "approach[h] the student's parent(s)/guardian(s) about the issue."

48.     The Guidance Document goes even further to conceal gender identity information from parents of high school students. In cases where "parents may already be aware" of a student's gender identity, the document states that "notification may be unnecessary." In other cases, however, the document claims that "notifying parents" can "carr[y] risks for the student, such as rejection." In those cases, the document directs staff to make "[c]ase-by-case decisions regarding parent notification . . . in consultation with the student." It instructs staff to consider "all factors that affect the student's well-being," but offers no explanation as to what those factors are and does not instruct staff to consider parental rights. These instructions directly contradict the document's supposed requirement that "[s]chool staff shall work with students and their parents/guardians to develop an appropriate plan to accommodate and support specific student needs."

## B.     Policy JQ

49.     AACPS went beyond mere guidance to adopt an official policy facilitating student gender transitions.

50.     On June 16, 2021, AACPS adopted Policy JQ, entitled "Safe and Inclusive Environments for LGBTQ+ Students." The policy enacts a number of provisions designed to "affir[m]" students' non-biological gender identities.

51.    Relevant here, Policy JQ guarantees "the right of any student to be addressed by a name and pronoun that correspond to the student's gender identity." It also "supports the use of gender-inclusive terminology when practicable."

52.    Policy JQ also enshrines "the right of any student to use school facilities that correspond with the gender identity the student consistently demonstrates and with which the student identifies." Per the policy, students have the "right" to use whatever "facilities with which [they are] most comfortable."

53.    Policy JQ treats any deviation from these practices—*i.e.*, the decision *not* to affirm a student's non-biological gender identity—as "discrimination and harassment."

## C.    Regulation JQ-RA

54.    Policy JQ empowers AACPS leadership "to develop regulations to implement this policy." Accordingly, on June 16, 2021, AACPS issued Regulation JQ-RA. Like Policy JQ, Regulation JQ-RA is entitled "Safe and Inclusive Environments for LGBTQ+ Students." Regulation JQ-RA was most recently revised on October 31, 2023.

55.    Regulation JQ-RA's purpose is to "establish procedures" that implement the district's aforementioned Guidance Document on gender identity and "provide support" for AACPS students "regardless of their sex, sexual orientation, gender identity, or gender expression." To implement this directive, the regulation instructs school staff to facilitate a student's gender transition in a number of ways.

56.    First, like the Guidance Document, the regulation instructs staff to address a student using their "preferred name and pronoun," even if the student has not legally changed their name or gender and even if the student's "official school records" do not reflect the student's professed gender identity. The "school principal" must "communicate with appropriate staff about a student who wishes to be addressed by a specific name or pronoun."

15

57.     Second, if a student *does* wish to change their gender in official records, they are not required to provide any "documentation" attesting to the change. Instead, "[s]elf-identification of a student's gender is sufficient" to "change a student's gender in the official student record."

58.     Third, students are given "access to the school facilities that correspond with the gender identity with which the student identifies." This includes locker rooms, restrooms, showers, and sleeping areas or other facilities provided during overnight field trips and camps. Again, for other students who are "uncomfortable sharing" these facilities with transgender students of the opposite biological sex, their only other option is to use an "alternative" facility.

59.     Fourth, a "student shall be permitted to participate in physical education classes and intramural sports in a manner aligned with the student's gender identity." "Decisions regarding a student's participation in interscholastic athletics shall be in accordance with the Maryland Public Secondary Schools Athletic Association guidelines."

60.     Fifth, a student who identifies as transgender "shall have the right to dress in accordance with that student's gender identity, including" the right to "maintain a gender-neutral appearance." And staff "shall enforce the AACPS dress code" accordingly.

61.     Like the Guidance Document and Policy JQ, Regulation JQ-RA does not require parental notification or consent before requiring staff to facilitate a student's gender transition. Staff are required to use a student's non-biological name and pronouns, allow the student to access locker rooms and bathrooms reserved for the opposite biological sex, and assign the student to athletic teams based on the student's gender identity—all without even telling the student's parents how their child is being treated.

62.     In fact, Regulation JQ-RA treats "[i]nformation about a student's gender identity" as "confidential medical information." AACPS promises to "restrict access to its student information system to prevent disclosure of [this] information."

63.     AACPS says it will disclose information about a student's gender identity only if legally compelled to do so, and even then, only through narrow procedures. "[S]chool staff," for example, are prohibited from "disclos[ing] any information that may reveal a student's gender identity unless legally required to do so with the proper authorization." "If a school is legally required to disclose a student's gender identity, the school shall provide the *student* an opportunity to make that disclosure, where practicable."

64.     In effect, the Guidance Document, Policy JQ, and Regulation JQ-RA create a dual-track system in which AACPS actively transitions a student's gender at school while intentionally presenting parents with an incomplete—and materially misleading—account of their children's educational experience.

## IV.     AACPS Transitions Mary Doe's Gender Behind Her Parents' Backs.

### A.     The Does' Religious Beliefs and the Religious Upbringing of Mary

65.     Plaintiffs John and Jane Doe live in the AACPS school district with their daughter Mary Doe.

66.     The Does are practicing Christians who strive to live in accordance with their faith. They have consistently raised Mary in their Christian faith and continue to do so.

67.     Because of their Christian faith, the Does have sincerely held beliefs that govern their views on human nature, marriage, gender, sexuality, morality, politics, ethics, natural law, and social issues.

68.     As practicing Christians, the Does sincerely believe that God creates each person as male or female and that the complementary sexes reflect the image of God. The Does believe

that one's sex is determined by biology and is fixed at birth and that it is impossible to change one's sex. They believe that rejection of one's biological sex is a rejection of the image of God within that person. The Does do not believe that "gender" is a coherent category separate from sex.

69.    The Does' understanding of sex and gender is grounded not only in their Christian faith but also in biological reality. They believe that a person's gender, which they understand to be synonymous with biological sex, is determined by that person's DNA, is fixed from conception, and cannot be changed because no medical intervention, hormone treatment, surgery, or social transition alters a person's DNA.

70.    The Does believe that to acknowledge or endorse the idea that a person's sex can be altered is to speak against God and would violate their sincerely held religious and philosophical beliefs. They believe that referring to another person with pronouns that do not correspond with that person's biological sex is harmful to that person because it is false.

71.    The Does have a religious obligation to raise Mary in accordance with their beliefs.

72.    The Does acknowledge that some people can be confused about their gender. But the Does do not believe that "affirming" a child's non-biological gender identity is the right response to such confusion. The Does do not believe that children can be "gender-neutral" or "transgender."

73.    The Does believe that issues of sex and gender are sensitive issues that should be left to parents to discuss and resolve with their children—not schools. This view stems from the Does' sincerely held religious beliefs.

74.    These religious beliefs are contrary to Defendants' belief that "[a] person's gender identity can be the same [as] or different than the sex assigned at birth." As a result, the Does

18

oppose Defendants' acceptance, encouragement, and facilitation of students' self-selection of genders and pronouns.

75.    The Does do not support Defendants' adoption or enforcement of AACP's Guidance Document, Policy JQ, or Regulation JQ-RA. They strongly object to any attempt to apply these policies to them or Mary.

76.    Policy JQ, the Guidance Document, and Regulation JQ-RA are antithetical to the religious pillars and teachings of the Does' Christian faith. The policies endorse views—like the alleged fluidity of sex and gender, and the idea that a person can self-select such identities—that directly conflict with their beliefs.

77.    Subjecting Mary and the Does to these policies therefore violates the Does' religious beliefs.

**B.    AACPS Socially Transitioned Mary without Parental Notice or Consent**

78.    On December 10, 2025, the Does received an email from an AACPS staff member stating that a food-based lab experiment would be conducted in one of Mary's classes the following day.

79.    In the email, the staff member states, "If you or [male name] have any questions about the lab, please don't hesitate to ask."

80.    The male name used in the email is not Mary's legal name.

81.    Approximately forty minutes after the original email was sent, the Does received a second email stating that the staff member wanted to recall the message.

82.    Approximately ten minutes after the second email was sent, the staff member sent a third email identical to the first, except it substituted Mary's legal name for the male name.

83.    Immediately following the third email, the staff member sent a fourth email stating, "I just realized I sent the email below to the wrong addresses."

19

84. The Does, who are familiar with Mary's classmates as a result of Mary having attended the same school district for several years, knew that there was no classmate with the male name mentioned in the first email.

85. Thus, the Does were alarmed by the staff member's emails and suspected that material information was being withheld from them. The Does asked the staff member to contact them immediately.

86. The next day, the staff member called the Does and admitted to lying in the emails described above. The staff member said that Mary requested to be referred to by the male name used in the first email.

87. The staff member explained that at the beginning of the semester, the staff member approached each student individually, asked them what name they preferred to be called, and recorded their responses in the staff member's records.

88. According to the staff member, this procedure was performed with Mary, and Mary asked to be referred to by the male name used in the first email.

89. The staff member also admitted to having private, one-on-one meetings with each student to discuss their preferred pronouns. This meeting occurred separately from the inquiry regarding a student's preferred name.

90. The staff member stated that school policy permitted all staff members to ask students for their preferred names and pronouns.

91. When the Does requested details on when these meetings with Mary had taken place and what was specifically discussed, the staff member refused to provide further information. The staff member stated that the school administration should be involved before any additional questions were answered.

92.    The Does agreed to involve the school administration. However, they also unequivocally stated that Mary was to be referred to only by her legal name and by pronouns corresponding with her biological sex, and that the school was to cease and desist from referring to Mary by the male name used in the staff member's first email.

93.    After this phone conversation, on the same day, the Does sent an email to the staff member summarizing the call and reiterating their demand that Mary be referred to by her legal name and biological pronouns in all classes and during school-related activities.

94.    In their email, the Does also made several record requests. Specifically, the Does requested copies of: (1) the policy that permits teachers and staff to ask students for their preferred names and pronouns; (2) the exact format used when asking these questions to students in a one-on-one interaction, as well as any form, record, or method used to document students' responses; (3) what, if any, other questions the staff member asked Mary; and (4) all information regarding what name and pronouns Mary stated that she preferred.

95.    The staff member forwarded the Does' email to the school administration.

96.    That same day, the school's assistant principal, Philip Casolo, responded to the Does' email, stating that the "law requires teachers to honor the names and pronouns preferred by students."

97.    Assistant Principal Casolo also refused to provide the records that the Does requested in their email. According to Casolo, "[i]n this situation, the law requires [the staff member] and [others] to honor [Mary's] preferred name . . . while in school, and [the staff member] will not be required to provide you with the items you are requesting in your email."

98.    Assistant Principal Casolo specifically cited Regulation JQ-RA as the "law" requiring the staff member to use Mary's "preferred" name and permitting the school to deny the

Does any additional information about their daughter's status. Casolo indicated that, because Regulation JQ-RA is an AACPS regulation and not specific to Mary's school, any additional objections must be lodged with AACPS's central office.

99.     Notwithstanding Casolo's email, the staff member who sent the December 10 email assured the Does that, moving forward, Mary would only be referred to by her legal name. At this time, the Does' understanding was that this staff member was the only one who had referred to Mary by the male name. Thus, when the staff member assured them that only Mary's legal name would be used moving forward and the class concluded a few weeks later in January 2026, the Does believed the matter was resolved and that all AACPS staff referred to Mary by her legal name only.

100.     That belief was shattered on May 1, 2026, when the Does received an email from another staff member regarding an upcoming off-campus field trip. The email, sent to all parents of students attending the trip, had an attached document with logistical details and a breakdown of students organized by chaperone group.

101.     Mary's legal name was not listed in that breakdown. However, the same male name mentioned in the December 2025 email was listed with the Does' surname, effectively "outing" Mary to all parents who received the email.

102.     The Does immediately responded to the email, requesting that the staff member call them as soon as possible.

103.     Later that evening, the staff member called the Does. When the Does stated that they did not see Mary's name on the student list, the staff member claimed Mary had been accidentally omitted. When the Does inquired about the student listed with the suspect male name, the staff member stated that this was another student in the class who shared the Does' surname.

104. The Does told the staff member that they knew this explanation was false, as they were familiar with the students in Mary's graduating class and knew that there was no child with that specific male name who also shared their surname.

105. Confronted with the truth, the staff member admitted to lying, stated that there was no student with that male name, and that the male name on the list was meant to refer to Mary.

106. The staff member stated that Mary had asked to be referred to by that male name in class, and that is why Mary was listed as such. The staff member also stated that school policy permits staff members to ask students for their preferred names and pronouns. By this point, the Does had already informed the school that they objected to their daughter being referred to by a male name or masculine pronouns. Nevertheless, the school continued to refer to their daughter in that manner.

107. The Does reminded the staff member of Mary's legal name. They instructed the staff member that Mary was not to be referred to by anything other than her legal name under any circumstances. The Does further informed the staff member that Mary would no longer be attending the field trip, as the staff member's dishonesty had destroyed any trust the Does might have placed in the staff member to supervise their child on an off-campus excursion. The Does requested a refund of the field trip expenses they had paid, totaling $334.90.

108. The staff member apologized to the Does, affirmed that Mary would only be referred to by her legal name moving forward, and agreed to inquire about a refund for the field trip expenses.

109. Two weeks passed without any additional correspondence from the staff member.

110. On May 18, 2026, the Does emailed the staff member, summarizing their May 1 phone conversation, reiterating that Mary should be referred to only by her legal name, and requesting an update on the field trip refund.

111. The Does also made several record and information requests in their email, including: (1) the policy that permits teachers and staff to ask students for their preferred names and pronouns; (2) the exact format used when asking these questions, as well as any form, record, or method used to document students' responses; (3) what name and pronouns the staff member used to refer to Mary in class and how that information was obtained; (4) what conversations took place with Mary regarding names, pronouns, or gender identity; (5) what, if any, other personal questions were asked during those conversations; (6) what information was recorded or documented regarding those conversations; (7) copies of any records, notes, emails, or other documentation related to those conversations; and (8) copies of any records reflecting the use of any alternate names or pronouns in Mary's educational records.

112. Later that day, Assistant Principal Casolo called the Does. Casolo reiterated that the school was following the "law" and "policy" (specifically, Regulation JQ-RA) when referring to Mary with the male name. He also stated that no refund would be issued for the field trip.

113. The Does responded that the text of the regulation requires "[s]chool staff [to] work with a student *and the student's parent(s)/guardian(s)* to develop an appropriate plan to accommodate and support the student and their gender identity" unless there is a genuine concern for the student's safety, and that no one from AACPS attempted to contact the Does to develop such a plan.

114. Assistant Principal Casolo asserted that this part of the regulation did not apply to high school students; claimed that discussion with the Does would be fruitless because the parties

24

would just "continue to go around and around" on the issue; and stated that there was nothing further the school administration would do to address the issue. Casolo told the Does that, if they wished to lodge a further objection, they would have to raise their concerns directly with the assistant superintendent of AACPS.

115.    The Does asked Casolo to initiate a meeting with the assistant superintendent.

116.    Following this conversation, later that same day, the Does emailed Casolo, summarizing their conversation and the two incidents in which Mary had been referred to by a male name, and re-upping their records request and refund request.

117.    In their email, the Does also stated that the school's actions and treatment of Mary conflicted with their sincerely held religious beliefs. The Does reiterated that they did not consent to the use of any "preferred names" for Mary.

118.    Assistant Principal Casolo responded that the Broadneck High School administration had contacted the AACPS central office (led by Superintendent Bedell) and legal team regarding the Does' concerns. According to Casolo, AACPS leadership confirmed that Mary's school was complying with AACPS regulations. Contrary to his statements over the phone, Casolo wrote in the email that any appeal must first be filed with the principal of Broadneck High School, Katherine Smith, before it could be elevated further to AACPS leadership.

119.    Accordingly, the Does immediately forwarded their email chain to Principal Smith and asked Smith to address the questions and requests they had originally directed to Assistant Principal Casolo.

120.    The next day, on May 19, 2026, Principal Smith confirmed receipt of the Does' email and formal appeal and stated that a response would be provided within ten school days.

121.    Principal Smith failed to respond to the Does within ten school days.

122. On June 5, 2023, the Does emailed Principal Smith, noting that eleven school days had passed, and asked for an update on their request.

123. On June 6, 2026, Smith responded, addressing each of the Does' requests in turn. First, Smith stated that the school was denying the Does' refund request because "[t]he signed field trip permission form clearly stated that refunds would not be provided once payments were submitted and commitments were made for participation."

124. Regarding the Does' questions concerning AACPS Regulation JQ-RA, Smith confirmed that the regulation allows school staff to socially transition a child's gender without informing the parents. Specifically, the principal explained:

> The regulation states that students have the right to be addressed by their preferred name and pronouns while at school. Staff members are trained and expected to honor student preferred names and pronouns in the school setting. The reference in the regulation regarding "working with parents" means that school staff may help families navigate conversations and determine how best to support students while maintaining a safe and inclusive learning environment.

125. Finally, in response to the Does' records request, Smith stated that "you may schedule an appointment to review [Mary's] educational records in accordance with FERPA. However, requests for internal emails, personal notes, or other staff communications would require appropriate legal process, including a subpoena where applicable."

126. Indeed, on July 9, 2026, Jane Doe visited Broadneck High School to review school records relating to her daughter Mary. The records provided by school staff did not contain any information regarding the name that school staff have used or currently use to refer to Mary; the gender identity that school staff associate with Mary; or measures school staff have taken, are taking, or are planning to take to facilitate Mary's gender transition. When Jane Doe inquired why the school did not provide that information, school staff responded that the Does were not entitled to that information because some, if not all, of that information was not considered educational

26

records. School staff stated their belief that AACPS is obligated to inform the Does only if school staff believe Mary was going to engage in self-harm.

**C.    AACPS's Actions Injure the Does' First and Fourteenth Amendment Rights**

127.    Defendants' policies (the Guidance Document, Policy JQ, and Regulation JQ-RA) and their actions (socially transitioning Mary Doe's gender while withholding that information from her parents) have caused the Does severe and lasting harm.

128.    Under Defendants' policies, no AACPS staff member has ever intentionally informed the Does that Mary requested to be referred to by a male name. Nor were the Does ever asked for permission to refer to Mary with a male name. Instead, under Defendants' policies, school staff are required to refer to Mary using a male name and facilitate her social transition without informing the Does or securing their consent.

129.    Indeed, when the Does learned that AACPS staff members were referring to their daughter using a male name, they repeatedly invoked their parental rights, instructed staff members to refrain from referring to their daughter with a male name, and demanded additional information about their daughter's status and staff members' conversations with their daughter. The Does' demands, however, have been ignored or outright denied. AACPS staff members, including Principal Smith and Assistant Principal Casolo, have repeatedly stated that AACPS policy, including Regulation JQ-RA, requires AACPS staff to refer to their daughter using male terms—even if the Does expressly direct AACPS staff not to use such language—and permits them to withhold the information the Does have requested about AACPS staff members' interactions with their daughter.

130.    To the Does' knowledge, AACPS staff, including Principal Smith and Assistant Principal Casolo, continue to defy the Does' demands to cease and desist from referring to Mary by a male name.

131. Additionally, the Does are aware that, under AACPS policies, school staff are required to take a number of additional steps to "affirm" a student's self-professed gender identity, including allowing the student to use opposite-sex bathrooms and locker rooms and allowing the student to participate in sports, clubs, and other activities based on their self-identified gender rather than their biological sex.

132. Because AACPS policy permits school staff to take these steps without informing parents, the Does have no way to determine whether AACPS staff have allowed their daughter to enter male restrooms, allowed her to participate in sports with biological males, or otherwise facilitated Mary's social gender transition at school. The Does are concerned that AACPS staff will take such steps in direct contravention of their wishes.

133. The Does object to the Guidance Document, Policy JQ, Regulation JQ-RA, and Defendant's actions implementing these policies because they permit and/or facilitate a student's gender transition at school without parental knowledge or consent. This frustrates the Does' constitutionally protected ability to direct their daughter's upbringing and excludes them from important decisions bearing on their daughter's mental health, sense of self, and emotional and physical well-being.

134. It also interferes with the Does' constitutional right to guide Mary's religious development by facilitating conduct that conflicts with their sincerely held religious beliefs without affording them notice, consent, or any opportunity for an exemption or opt-out.

135. The Does face an ongoing, daily risk that AACPS continues to facilitate Mary's social gender transition without their knowledge or consent.

28

136. Defendants' policies and actions excluding the Does from important decisions about their daughter in this manner have caused the Does emotional distress, anxiety, and fear over Mary's well-being, mental health, and spirituality.

## COUNT I
### Violation of the First Amendment
### (Free Exercise Clause)
*Against All Defendants*

137. Plaintiffs incorporate the foregoing paragraphs as though fully restated here.

138. The First Amendment to the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Free Exercise Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

139. This right to the free exercise of religion encompasses a parental right to guide the religious development of one's children. *Wisconsin v. Yoder*, 406 U.S. 205, 213–14, 218 (1972).

140. School district policies that facilitate a student's social gender transition without parental knowledge or consent substantially interfere with this right and trigger strict scrutiny. *Mirabelli*, 607 U.S. at 496–97.

141. The Does are Christians with sincere religious beliefs that govern their views about human nature, the complementarity of the sexes, and the immutability of sex as created by God.

142. The Does have a religious obligation to guide Mary's moral and spiritual development consistent with their Christian faith.

143. The Guidance Document, Policy JQ, and Regulation JQ-RA facilitate conduct—the social gender transition of Mary without parental knowledge or consent—that directly conflicts with the Does' sincerely held religious beliefs.

144. These policies require staff to accept a student's asserted gender identity, facilitate social transitions using chosen names and pronouns, provide students access to opposite-sex facilities, and otherwise treat students based on their gender identity. And under the policies, school staff can do all of this while affirmatively hiding their actions from parents.

145. Defendants' policies do not afford parents any notice, do not ask for parental consent, and do not offer any opportunity for religious exemptions or opt-outs.

146. Defendants' policies are materially indistinguishable from the policies the U.S. Supreme Court held were likely unconstitutional in *Mirabelli*.

147. By facilitating Mary's social gender transition without parental knowledge or consent, Defendants' policies and their actions implementing those policies have substantially interfered with and continue to interfere with the Does' free-exercise rights.

148. Defendants' policies and their actions implementing those policies have caused and continue to cause the Does to suffer on account of their religious beliefs by facilitating conduct contrary to those beliefs and concealing that conduct from them, thereby depriving them of the ability to fulfill their religious obligation to guide Mary's moral and spiritual development.

149. Defendants' policies and actions were not and are not narrowly tailored to achieve a compelling government interest. Defendants' asserted interests in student safety and privacy could be achieved through less restrictive means—for example, by allowing religious exemptions while limiting disclosure only where there is a credible risk of abuse.

150. Defendants' policies and practices therefore have violated and continue to violate the Does' rights under the Free Exercise Clause of the First Amendment. The Does have no adequate remedy at law and suffer ongoing, irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing their gender-identity policies.

30

151. Defendants adopted and implemented the challenged policies "under color of state law" within the meaning of §1983.

**COUNT II**
**Violation of the Fourteenth Amendment**
**(Parental Exclusion)**
*Against All Defendants*

152. Plaintiffs incorporate the foregoing paragraphs as though fully restated here.

153. The Fourteenth Amendment of the United States Constitution prohibits the deprivation of liberty without due process of law. U.S. Const. amend. XIV, §1, cl. 3.

154. The Fourteenth Amendment also protects the fundamental right of parents to direct the upbringing and education of their children. *Pierce*, 268 U.S. at 534–35; *Meyer*, 262 U.S. at 399–400. This fundamental right encompasses the right of a parent to participate and make decisions bearing on a child's mental health. *Parham*, 442 U.S. at 602.

155. Gender dysphoria is a condition that significantly impacts a child's mental health. *Mirabelli*, 607 U.S. at 497.

156. In *Mirabelli*, the Supreme Court reaffirmed that primary authority over child-rearing rests with parents, not the State, and that policies concealing information from parents and facilitating a child's gender transition at school likely violate the Due Process Clause. *Id.*

157. The Does seek to direct Mary's upbringing and education, including decisions about her mental health and any gender confusion she experiences.

158. The Guidance Document, Policy JQ, and Regulation JQ-RA create a framework in which AACPS affirmatively facilitates social transitions—including the use of chosen names and pronouns and access to sex-segregated facilities based on gender identity—while systematically excluding parents from knowledge of, participation in, and consent to these actions.

159.    The Guidance Document explicitly directs staff to transition students while concealing that action from parents, stating that "decisions regarding parent notification should be made in consultation with the student" on a case-by-case basis, without any mention of parental rights. Regulation JQ-RA likewise states that staff "may not disclose any information" about "a student's gender identity" unless "legally required to do so." AACPS staff members have expressly told the Does that these policies allow staff to facilitate a student's gender transition without informing parents, without securing parental consent, and even if parents specifically deny such consent.

160.    Defendants' policies ensure that material decisions affecting a student's identity, social environment, and mental health are made without parental notice, involvement, or consent.

161.    The Does consequently have been barred, and are still barred, from making decisions about Mary's mental health and any gender dysphoria she experiences.

162.    Defendants' policies and practices therefore have violated and continue to violate the Does' due-process rights under the Fourteenth Amendment of the United States Constitution. The Does have no adequate remedy at law and suffer ongoing, irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing Policy JQ and its implementing documents against them and Mary.

163.    Defendants adopted and implemented the challenged policies "under color of state law" within the meaning of §1983.

**PRAYER FOR RELIEF**

Plaintiff respectfully demands the following relief:

a.   A declaration that the Guidance Document, Policy JQ, and Regulation JQ-RA violate the First and Fourteenth Amendments to the United States Constitution;

b. A preliminary and permanent injunction barring Defendants from enforcing the Guidance Document, Policy JQ, and Regulation JQ-RA—or any materially similar policy, provision, or law that applies in the AACPS system—against Mary and the Does;

c. A preliminary and permanent injunction barring Defendants from referring to Mary by any name other than her legal name;

d. A preliminary and permanent injunction requiring Defendants to provide the Does with timely notice of, and the opportunity to consent to or opt out of, any policy or practice that facilitates or affirms a student's gender transition at school or withholds information from parents regarding such matters;

e. Nominal damages;

f. Attorneys' fees and costs pursuant to 42 U.S.C. §1988;

g. Such other relief as the Court deems proper.

Dated: July 17, 2026

Respectfully Submitted,

*/s/ Ian Prior*

Rachael C. T. Wyrick*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
rachael@consovoymccarthy.com

Ian Prior (Bar No. 30683)
Crystal Clanton*
Rachael Griffin*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE, Suite 231
Washington, D.C. 20003
(202) 964-3721
ian.prior@aflegal.org
crystal.clanton@aflegal.org
rachael.griffin@aflegal.org

* *Admitted pro hac vice*

*Counsel for Plaintiffs*

33