**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JOHN and JANE DOE,

     *Plaintiffs*,

v.

GLORIA DENT, in her official capacity as a
member of the Anne Arundel County Board
of Education, et al.,

     *Defendants*.

Case No. 1:26-cv-02690-RDB

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................................................... ii
INTRODUCTION ....................................................................................................1
BACKGROUND......................................................................................................2
    I.    Parental-exclusion policies are harming families across the country...............................2
    II.   AACPS's policies facilitate gender transition without parental involvement..................4
          A.   The Guidance Document.................................................................................5
          B.   Policy JQ ......................................................................................................6
          C.   Regulation JQ-RA .......................................................................................7
   III.  AACPS faculty are facilitating Mary's social gender transition without the Does'
         consent. .........................................................................................................8
ARGUMENT .........................................................................................................11
    I.    The Does are likely to succeed on the merits. ................................................12
          A.   The Does have standing..............................................................................12
          B.   AACPS's policies violate the First Amendment. ......................................13
          C.   AACPS's policies violate the Fourteenth Amendment. .............................19
    II.   The remaining factors favor a preliminary injunction....................................24
   III.  The Court should waive the Rule 65(c) security bond. ...................................25
CONCLUSION ......................................................................................................25
CERTIFICATE OF SERVICE................................................................................27

## TABLE OF AUTHORITIES

**Cases**

*CACI, Inc.-Fed. v. U.S. Navy*,
   674 F. Supp. 3d 257 (E.D. Va. 2023) ...................................................................................25

*Cano v. S.C. Dep't of Corr.*,
   No. 9:22-cv-04247, 2025 WL 2919054 (D.S.C. June 16, 2025)................................................3

*Centro Tepeyac v. Montgomery County*,
   722 F.3d 184 (4th Cir. 2013) ...............................................................................................25

*City of Huntington Beach v. Newsom*,
   No. 25-3826, 2026 WL 1785110 (9th Cir. June 18, 2026) ..........................................12, 21–22

*Diamond Alt. Energy, LLC v. EPA*,
   606 U.S. 100 (2025) ...................................................................................................12, 18

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ...............................................14, 19

*Doe v Pine Richland Sch. Dist.*,
   No. 24-3348, 2026 WL 1103489 (3d Cir. Apr. 23, 2026)...........................................................13

*Elrod v. Burns*,
   427 U.S. 347 (1976) .............................................................................................................24

*Espinoza v. Mont. Dep't of Revenue*,
   591 U.S. 464 (2020) .............................................................................................................13

*Frazier v. Prince George's County*,
   86 F.4th 537 (4th Cir. 2023).................................................................................................11

*Fulton v. Philadelphia*,
   593 U.S. 522 (2021) .............................................................................................................19

*Gruenke v. Seip*,
   225 F.3d 290 (3d Cir. 2000) .................................................................................................23

*H.L. v. Matheson*,
   450 U.S. 398 (1981)..............................................................................................................20

*Kaltenbach v. Hilliard City Schs.*,
   No. 24-3336, 2025 WL 1147577 (6th Cir. Mar. 27, 2025) ....................................................4, 21

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) .............................................................................................................14

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023)....................................................................................................2

*Leaders of Beautiful Struggle v. Baltimore Police Dep't*,
   2 F.4th 330 (4th Cir. 2021).......................................................................................12, 24–25

*M.A.B. v. Board of Education of Talbot Cnty.*,
   286 F. Supp. 3d 704 (D. Md. 2018)........................................................................................3

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ....................................................................................................14–21

*Mendoza Palacios v. Mullin*,
No. 26-cv-648, 2026 WL 933319 (D. Md. Apr. 7, 2026) ........................................25

*Meyer v. Nebraska*,
262 U.S. 390 (1923) ..................................................................................................20

*Mirabelli v. Bonta*,
607 U.S. 492 (2026) ..................................................................................1, 4, 12–25

*Mirabelli v. Olson*,
691 F. Supp. 3d 1197 (S.D. Cal. 2023) ......................................................................3

*Parents 1 v. Montgomery County Bd. of Educ.*,
78 F.4th 622 (4th Cir. 2023).................................................................................13, 24

*Parham v. J.R.*,
442 U.S. 584 (1979) ......................................................................................19–21, 23

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925) ..................................................................................................20

*Stinnie v. Holcomb*,
355 F. Supp. 3d 514 (W.D. Va. 2018)........................................................................17

*Troxel v. Granville*,
530 U.S. 57 (2000) ..............................................................................................19–22

*United States v. Skrmetti*,
605 U.S. 495 (2025) ...............................................................................................2, 21

*United States v. Williams*,
155 F.3d 418 (4th Cir. 1988) ......................................................................................13

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ..................................................................................................19

*West Virginia v. Barnette*,
319 U.S. 624 (1943) ..................................................................................................14

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008) ......................................................................................................11

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ........................................................................................13–15, 17

iii

**INTRODUCTION**

Parents have the right, secured by the Constitution and repeatedly confirmed by the Supreme Court, to direct their children's upbringing and guide their religious development. Accordingly, schools may not "facilitat[e]" a "child's gender transition" without parents' consent, and parents have the "right not to be shut out of participation in decisions regarding their children's mental health." *Mirabelli v. Bonta*, 607 U.S. 492, 496–97 (2026).

Anne Arundel County Public Schools is trampling on these rights. AACPS policies require teachers and staff to actively facilitate students' gender transitions. According to these policies, AACPS must (1) defer to a student's self-selected gender identity, Ex. A at 4; (2) call students by the "name and pronoun that correspond to the student's gender identity," Ex. B at 2; (3) allow students to use the locker rooms and restrooms "of the gender with which they identify," Ex. A at 6; and (4) allow students to participate in physical education and intramural sports, and bunk in rooms on overnight trips, in a manner that "correspond[s] with the[ir] gender identity," Ex. C at 3–4. Worse, AACPS's policies allow staff to do all of this while actively concealing their actions from a student's parents. There is no mechanism requiring staff to notify parents or obtain parental consent.

Plaintiffs John and Jane Doe have a daughter, Mary, who attends an AACPS high school. The Does want to raise and educate Mary according to their religious beliefs that God creates each person as male or female, that sex is based on biology, and that one's sex cannot be changed. And they want to control how decisions are made for Mary concerning these important issues. But AACPS has robbed the Does of that authority. The district has applied its policies to facilitate Mary's social gender transition, referring to her with a male name at school. The district has done so despite repeated instructions from the Does that Mary is to be addressed using only her legal

name. And the district has actively concealed its actions from the Does, including through outright lies and deception.

AACPS's policies and actions violate the Does' parental rights under the First and Fourteenth Amendments. This Court should grant the Does' motion for a preliminary injunction.

## BACKGROUND

### I. Parental-exclusion policies are harming families across the country.

In recent years, the number of young people experiencing gender dysphoria has surged. *See, e.g.*, *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 468 (6th Cir. 2023) ("By one account, 2021 saw three times more diagnoses of gender dysphoria among minors than 2017 did."). Gender dysphoria is a "medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and biological sex." *United States v. Skrmetti*, 605 U.S. 495, 502–03 (2025).

Despite assertions to the contrary, "there is no medical consensus on how best to treat gender dysphoria in children." *Id.* at 530 (Thomas, J., concurring). Indeed, major scientific associations have recently flipped their positions and come out against certain interventions for children under eighteen. *See* Ex. D at 1–2 (noting the American Society of Plastic Surgeons and American Medical Association endorse age limits on gender-related surgery). And, according to one review, "[g]iven the weakness of the research" on the effectiveness of social transition, it is "unclear whether it alters the trajectory of gender development, and what short- and longer-term impact [it] may have on mental health." Ex. E at 163. The proper treatment of gender dysphoria raises "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field." *Skrmetti*, 605 U.S. at 525 (majority opinion). And many parents, too, have different views on the best way to help and support a child who suffers with gender confusion.

One common response to gender dysphoria is "social transition." Social transition often involves using a new ("preferred") name or pronouns, adopting clothing and grooming habits associated with your professed gender, using facilities (like bathrooms and locker rooms) reserved for that gender, and participating in activities (like sex-segregated sports teams) that correspond to that gender. *See, e.g.*, *M.A.B. v. Board of Education of Talbot Cnty.*, 286 F. Supp. 3d 704, 708 (D. Md. 2018); *Cano v. S.C. Dep't of Corr.*, No. 9:22-cv-04247, 2025 WL 2919054, at *2 (D.S.C. June 16, 2025) (R&R).

Social transition isn't a neutral response. It "is an active intervention" that can have "significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes." Ex. E at 158. Social transition is "one of the most difficult psychological changes a person can experience." *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1208 (S.D. Cal. 2023) (quoting testimony of Dr. Erica E. Anderson).

Not only is social transition a powerful psychological act, but it also makes children more likely to pursue irreversible treatments like hormones and puberty blockers down the line. Most children with gender dysphoria diagnoses do "not remain [gender dysphoric]/gender incongruent in[to] adolescence." Ex. F. at 3879. But "[s]ocial transition is associated with the persistence of [gender dysphoria]/gender incongruence as a child progresses into adolescence." *Id.* In one study, "93% of those who socially transitioned between three and 12 years old continued to identify as transgender" five years later. Ex. E at 162. And children who are socially transitioned usually do not stop there. Instead, they go on to seek increasingly invasive "treatments," like puberty blockers, sterilizing cross-sex hormones, and surgeries. *See* Ex. G at 14, 39–40 (finding that the majority of a group of study participants who had socially transitioned prior to the study moved on to puberty blockers and cross-sex hormones).

Despite the fact that social transition is a powerful psychological act and lacks scientific evidence to support it, school districts across the country have adopted policies to facilitate children's social transition. Under these policies, schools encourage and support students' transitioning to a new gender without parental knowledge or consent. Often, the policies encourage schools to affirmatively hide their actions from parents. According to a list from Defending Education, there are currently 1,217 districts across the country with these policies, encompassing over 20,000 schools. *See* Ex. H.

These policies are wreaking havoc on children. In some cases, parents only learn about years-long efforts to socially transition their children after the child has been the victim of bullying or suffered a mental health emergency like attempted suicide. *See, e.g.*, *Mirabelli*, 607 U.S. at 493–94; *Kaltenbach v. Hilliard City Schs.*, No. 24-3336, 2025 WL 1147577, at *1–2 (6th Cir. Mar. 27, 2025) (Thapar, J., concurring). Parental exclusion policies take parents—the ones who have the most comprehensive understanding of their own children—out of the equation and substitute the State as the decisionmaker. And when parents are kept in the dark, they can't provide the emotional support or secure the medical care that their children need. *Kaltenbach*, 2025 WL 1147577, at *2 (schools, through "deception," "stri[p] them of that possibility").

## II.     AACPS's policies facilitate gender transition without parental involvement.

AACPS has joined this troubling trend. Undaunted by the lack of medical or scientific consensus about gender transition as a treatment, AACPS has nevertheless installed a series of policies, guidance, and rules that embrace its students' gender transitions with open arms. And the policies do so without requiring the involvement or consent of parents. In some cases, the policies even *require* school officials to exclude parents and conceal critical personal information about their children.

4

### A.    The Guidance Document

In 2019, AACPS published a document entitled "Students and Gender Identity: Guidelines for Support." *See* Ex. A (the "Guidance Document"). The document adopts views that legitimize the concept of gender identity and the act of gender transition, which it describes as "the process by which a person goes from living and/or identifying as one gender to living and/or identifying as another." *Id* at 2. That process, it says, may not necessarily include "medical intervention," and may simply be a "'social transition,' whereby [a person] begin[s] to live and identify as the gender consistent with their gender identity." *Id.* The document purports to "provid[e] information and guidance to students, parents, and school staff on the rights, responsibilities, and best educational practices with regard to gender identity and student support in" AACPS. *Id.* at 3.

The Guidance Document instructs AACPS staff to defer to a student's self-identification of their gender. *See id.* at 4 ("The person best situated to determine a student's *gender identity* is the student," and staff may ask for evidence of a gender identification "[o]nly if there is an objective basis that justifies questioning whether a student's asserted *gender identity* is genuine."). And when a student claims to identify as a gender different from his or her biological sex, the document requires staff to implement a number of responses to facilitate the student's transition:

- Staff must "addres[s]" students using the "name and pronoun that match the student's gender identity." *Id.* And school principals must "communicate with appropriate staff about students who wish to be addressed by a specific name or pronoun." *Id.*

- Staff must "enforce dress codes" according to gender identity rather than biological sex. *Id.* at 7. "Students shall have the right to dress in accordance with their gender identity." *Id.*

- Staff must allow students to use school "facilities" that match their self-professed gender identity rather than their biological sex. *Id.* at 6. This includes allowing students to "access" and "use" the "restrooms" and "locker rooms of the gender with which they identify." *Id.* (Notably, if another student is "uncomfortable sharing a common area" or intimate facility with a classmate of the other biological sex who identifies as transgender, *that student* is required to move to an "alternative" space. *Id.* at 7.)

- When students attend "overnight field trips and camps," they again "shall have access to facilities that correspond to their gender identity" rather than their biological sex. *Id.* at 7.

- "All students" must be allowed "to participate in physical education classes and intramural sports in a manner aligned with their gender identity." *Id.* at 6. It also contemplates allowing students to participate "in interscholastic athletics" according to their gender identity where athletic association guidelines allow such participation. *Id.*

The Guidance Document empowers staff to implement all of these so-called gender-affirming practices without any input from or consultation with a student's parents. Decisions "regarding parent notification" are to be made on a "[c]ase-by-case" basis in "consultation with the student." *Id.* at 4. To make that decision, staff must consider "all factors that affect the student's well-being," but the document does not instruct staff to consider parental rights as part of that calculus. *Id.* If the staff member suspects that a parent "may already be aware" of a student's gender identity, then notification is "unnecessary." *Id.* In fact, the only time the document suggests that a staff member *should* notify a parent is if the staff member believes that parents will "support the student" in their gender transition. *Id.*

### B.    Policy JQ

In 2021, AACPS went beyond mere guidance and adopted an official policy facilitating student gender transition. Policy JQ, entitled "Safe and Inclusive Environments for LGBTQ+ Students," enacts a number of provisions designed to "affir[m]" students' non-biological gender identities. Ex. B at 1. Like the Guidance Document, Policy JQ guarantees "the right of any student to be addressed by a name and pronoun that correspond to the student's gender identity." *Id.* at 2. It also "supports the use of gender-inclusive terminology when practicable." *Id.* And the policy enshrines "the right of any student to use school facilities that correspond with the gender identity the student consistently demonstrates and with which the student identifies." *Id.* Per the policy, students have the "right" to use whatever "facilities with which [they are] most comfortable." *Id.*

6

Policy JQ treats any deviation from these practices (in other words, any decision *not* to affirm a student's non-biological gender identity) as "discrimination and harassment." *Id.* at 1.

### C.    Regulation JQ-RA

Policy JQ empowers AACPS leadership "to develop regulations to implement this policy." *Id.* at 3. Accordingly, when it adopted the policy, AACPS also issued Regulation JQ-RA, which is likewise entitled "Safe and Inclusive Environments for LGBTQ+ Students." Ex. C at 1. The regulation's purpose is to "establish procedures" that implement the district's aforementioned Guidance Document on gender identity and "provide support" for AACPS students "regardless of their sex, sexual orientation, gender identity, or gender expression." *Id.* at 1. Like the Guidance Document and Policy JQ, the regulation compels AACPS staff to take a number of actions whenever a student expresses a non-biological gender identity:

- First, like the Guidance Document, the regulation instructs staff to address students using their "preferred name[s] and pronoun[s]," even if the students have not legally changed their name or gender and even if a student's "official school records" do not reflect the student's professed gender identity. *Id.* at 2. The "school principal" must "communicate with appropriate staff about a student who wishes to be addressed by a specific name or pronoun." *Id.*

- Second, if students do wish to change their gender in official records, they are not required to provide any "documentation" attesting to the change. *Id.* Instead, "[s]elf-identification of a student's gender is sufficient" to "change a student's gender in the official student record." *Id.*

- Third, students are given "access to the school facilities that correspond with the gender identity with which the student identifies." *Id.* at 3. This includes locker rooms, restrooms, showers, and sleeping areas or other facilities provided during overnight field trips and camps. *Id.* at 4. (Again, for students who are "uncomfortable sharing" these facilities with transgender students of the opposite biological sex, their only other option is to use an "alternative" facility. *Id.*)

- Fourth, a "student shall be permitted to participate in physical education classes and intramural sports in a manner aligned with the student's gender identity." *Id.* "Decisions regarding a student's participation in interscholastic athletics shall be in accordance with the Maryland Public Secondary Schools Athletic Association guidelines." *Id.*

- Fifth, a student who identifies as transgender "shall have the right to dress in accordance with that student's gender identity, including" the right to "maintain a gender-neutral appearance." *Id.* And staff "shall enforce the AACPS dress code" accordingly. *Id.*

Regulation JQ-RA requires staff to defer to a student's stated gender identity. *Id.* at 2. "A court-ordered name or gender change is not required, and the student is not required to change the student's official school records." *Id.* Nor is the student "required to produce medical evidence to demonstrate the student's gender identity." *Id.*

Like the Guidance Document and Policy JQ, Regulation JQ-RA does not require parental notification or consent before requiring staff to facilitate a student's gender transition. The regulation treats "[i]nformation about a student's gender identity" as "confidential" information and will disclose the information only if "legally required to do so with the proper authorization." *Id.* at 3. "If a school is legally required to disclose a student's gender identity, the school shall provide the *student* an opportunity to make that disclosure, where practicable." *Id.* (emphasis added). In fact, the only scenario in which the regulation suggests that staff will "work with" a student's "parent(s)/guardian(s)" is if parents will "*support*" the student's "gender identity." *Id.* at 2 (emphasis added). And even then, the regulation treats the parent as only one voice among many—no priority is given to the parent's preferences in terms of treatment.

In effect, the Guidance Document, Policy JQ, and Regulation JQ-RA create a dual-track system in which AACPS actively transitions a student's gender at school while intentionally presenting parents with an incomplete—and materially misleading—account of their children's educational experience.

## III. AACPS faculty are facilitating Mary's social gender transition without the Does' consent.

Policy JQ and its implementing documents harm the Does. One of the Does' children, Mary, attends an AACPS high school. John Doe Decl. ¶3; Jane Doe Decl. ¶3. The Does are

8

practicing Christians who strive to live in accordance with their faith. John Doe Decl. ¶4; Jane Doe Decl. ¶4. They believe that there are only two sexes, male and female, and that the complementary sexes reflect the image of God. John Doe Decl. ¶5; Jane Doe Decl. ¶5. The Does reject the idea that gender is separate from sex, and they believe it is impossible for people to change their biological sex. John Doe Decl. ¶5; Jane Doe Decl. ¶5. These beliefs govern their views on human nature, marriage, gender, sexuality, morality, politics, ethics, natural law, and social issues. John Doe Decl. ¶5; Jane Doe Decl. ¶5.

The Does therefore do not believe that Mary, or any of their children, can self-select their gender, claim a "gender identity" that conflicts with their biological sex, or participate in a social gender transition. John Doe Decl. ¶6; Jane Doe Decl. ¶6. The Does believe that referring to another person using pronouns that do not correspond with biological sex is harmful to that person because it is false. John Doe Decl. ¶7; Jane Doe Decl. ¶7. And they believe that they have a duty to raise their children in their religious tradition and teach them their religious beliefs. John Doe Decl. ¶10; Jane Doe Decl. ¶10. The Does oppose AACPS's acceptance, encouragement, and facilitation of students self-selecting their genders and pronouns. John Doe Decl. ¶12; Jane Doe Decl. ¶12.

AACPS is currently facilitating Mary's social gender transition at school without the Does' consent. John Doe Decl. ¶¶18, 95; Jane Doe Decl. ¶¶18, 95. In fact, AACPS made the decision to transition Mary's gender without even informing the Does, and the Does discovered AACPS's deception only by accident when two separate staff members inadvertently referred to Mary using a male name, apparently "self-selected" by Mary, in emails to the Does. John Doe Decl. ¶¶20–30, 47–54; Jane Doe Decl. ¶¶20–30, 47–54. No AACPS staff member has ever intentionally informed the Does that Mary requested to be referred to by a male name, and no staff member has ever asked

9

them for permission to refer to Mary by a male name. John Doe Decl. ¶¶77–78; Jane Doe Decl. ¶¶77–78.

Upon learning that AACPS personnel were facilitating Mary's transition behind their backs, the Does repeatedly and unequivocally stated that Mary is only to be referred to by her legal name. John Doe Decl. ¶¶35, 56; Jane Doe Decl. ¶¶35, 56. The Does have informed the school that using a male name for Mary conflicts with their sincerely held religious beliefs. John Doe Decl. ¶66; Jane Doe Decl. ¶66. Yet AACPS staff members—including the principal and assistant principal at Mary's school—refuse to honor or abide by the Does' demands, citing Regulation JQ-RA as "law" and "policy" that requires them to treat Mary as a male regardless of her parents' judgment about her best interests. John Doe Decl. ¶¶40–42, 62; Jane Doe Decl. ¶¶40–42, 62. School administrators also confirmed to the Does that AACPS policy allows school staff to facilitate a student's gender transition without notifying parents. John Doe Decl. ¶¶63–64, 73; Jane Doe Decl. ¶¶63–64; 73. Thus, still today, Mary is being referred to by the male name at school, despite the Does' instructions to the contrary. John Doe Decl. ¶¶72; 79; Jane Doe Decl. ¶¶72, 79.

The Does do not want Mary or themselves to be subject to AACPS's policies regarding student gender identities. John Doe Decl. ¶¶17, 83; Jane Doe Decl. ¶¶17, 83. The Does want the ability to opt Mary out of any AACPS policy or practice that facilitates or affirms a student's gender transition at school or withholds information from parents regarding such matters. John Doe Decl. ¶91; Jane Doe Decl. ¶91. They do not want their daughter to be referred to by any name other than her legal name or any pronouns other than biologically accurate female pronouns. John Doe Decl. ¶¶84–85; Jane Doe Decl. ¶¶84–85. They want Mary to use facilities like bathrooms and locker rooms, and participate in activities like physical education classes and sports, that correspond to her biological sex. John Doe Decl. ¶¶86–87; Jane Doe Decl. ¶¶86–87. And if Mary

10

expresses any gender confusion at school or if she requests to be called by any name other than her legal one or by pronouns that do not correspond with her biological sex, the Does want to be notified immediately before the school takes any actions to facilitate Mary's transition. John Doe Decl. ¶¶88–89; Jane Doe Decl. ¶¶88–89.

Under AACPS's policies, however, the Does have no way to know whether additional actions have been taken to facilitate Mary's social gender transition at school, including the use of preferred pronouns or access to restrooms, locker rooms, field-trip accommodations, or other activities aligned with a gender identity different from her biological sex. John Doe Decl. ¶91; Jane Doe Decl. ¶91. And AACPS staff are required to accept Mary's request to be referred to by a male name and facilitate her social gender transition without the Does' knowledge or consent. John Doe Decl. ¶92; Jane Doe Decl. ¶92. AACPS's policies have caused significant emotional distress, anxiety, and fear over Mary's well-being, mental health, and spirituality. John Doe Decl. ¶94; Jane Doe Decl. ¶94. Subjecting the Doe family to these policies violates the Does' right to direct Mary's education and upbringing and prevents the Does from raising Mary in accordance with their Christian beliefs. John Doe Decl. ¶¶97, 98; Jane Doe Decl. ¶¶97, 98.

## ARGUMENT

The Does are entitled to a preliminary injunction if they show four things: (1) They are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm if preliminary relief isn't granted," (3) "the balance of equities favors" an injunction, and (4) "an injunction is in the public interest." *Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)).

The Does are likely to prevail on their constitutional claims, which means they necessarily prevail on the remaining factors. When "there is a likely constitutional violation, the irreparable

11

harm factor is satisfied," the government "'is in no way harmed'" by a preliminary injunction that simply prevents it from violating the constitution, and "it is well-established that the public interest favors protecting constitutional rights." *Leaders of Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc).

## I.    The Does are likely to succeed on the merits.

Policy JQ and its implementing documents "conceal" critical "information" about students from their parents and "facilitate" students' "gender transitioning" without parental consent. *Mirabelli*, 607 U.S. at 497. AACPS used these policies to hide information about Mary from the Does and transition her gender without the Does' knowledge or consent. The policies and AACPS's actions likely violate the U.S. Constitution. *See id.* at 496–97.

### A.    The Does have standing.

The Does have Article III standing to challenge AACPS's policies generally and as applied to their daughter. To demonstrate standing, plaintiffs must show injury, causation, and redressability. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025). "When a plaintiff is the 'object' of a government regulation," there is "'little question'" that those requirements are met. *Id.* at 114.

In *Mirabelli*, the Supreme Court held that a class comprising parents "who object[ed] to" parental-exclusion policies or sought "a religious exemption" from the policies likely had standing to challenge those policies "because they are [the] objects of the challenged exclusion policies." 607 U.S. at 494–95, 498. To show standing, the parents were *not* required to make "any individualized showing" that "their child was likely to exhibit gender dysphoria" or that their child had already been subjected to a school's gender transition policies. *City of Huntington Beach v. Newsom*, No. 25-3826, 2026 WL 1785110, at *2 (9th Cir. June 18, 2026) (discussing *Mirabelli*);

12

*see also Doe v Pine Richland Sch. Dist.*, No. 24-3348, 2026 WL 1103489, at *3 (3d Cir. Apr. 23, 2026) (same).

The Does' standing here is even stronger than the parents' standing in *Mirabelli*. The Does aren't just "the objects of" AACPS's policies; AACPS has actually enforced those policies against the Does and used the policies to facilitate their daughter's transition. *Mirabelli*, 607 U.S. at 497–98. AACPS staff have had "discussions" with Mary about "gender-identity issues," inquired about her preferred terminology, used a male name to refer to her at school, and "ke[pt] … information about" Mary from the Does. *Parents 1 v. Montgomery County Bd. of Educ.*, 78 F.4th 622, 629–31 (4th Cir. 2023); *see, e.g.*, John Doe Decl. ¶¶30–32, 54–55; Jane Doe Decl. ¶¶30–32, 54–55.[1] And AACPS refused to cease these practices when the Does became aware of the situation and instructed AACPS to stop. The Does undoubtedly have standing to challenge policies that AACPS is actively enforcing against them and their daughter.

## B.     AACPS's policies violate the First Amendment.

AACPS's policies facilitating gender transitions without parental knowledge or consent violate the Free Exercise Clause both on their face and as applied to the Does.

**1.** Courts have "long recognized the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972)). For many people of faith, "there are few religious acts more important than the religious education of their children." *Mahmoud v. Taylor*, 606 U.S. 522,

---

[1] In *Parents 1*, the Fourth Circuit held that the plaintiff parents lacked standing because they did "not alleg[e] that they suspect their children might be considering gender transition." 78 F.4th at 630. To the extent *Parents 1* requires parents to allege that their children are likely to exhibit gender confusion, that information is actively "being withheld from them," or that their children are currently being "subject[ed] to a gender support plan" in order to show standing, *id.* at 629–30, it is "clearly undermined by the more recent Supreme Court decisio[n]" in *Mirabelli* holding the opposite. *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1988). In any event, as explained above, the Does satisfy *Parents 1* because AACPS *did* facilitate their daughter's social transition and *did* conceal that information from the Does.

547 (2025). "At its heart, the Free Exercise Clause of the First Amendment protects 'the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of' religious acts," including "[t]he practice of educating one's children in one's religious beliefs." *Id.* at 546–47 (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022)). *Mirabelli* could not be clearer that policies allowing the "unconsented facilitation of a child's gender transition" violate parents' right to "guide the religious development of their children." 607 U.S. at 496 (quoting *Mahmoud*, 606 U.S. at 559).

This right "extends" beyond one's own home, to "the choices that parents wish to make for their children outside the home," including in public schools. *Mahmoud*, 606 U.S. at 547. For example, in *West Virginia v. Barnette*, the Court addressed a public-school policy requiring students to participate in the Pledge of Allegiance. 319 U.S. 624, 626 (1943). Students and parents who objected believed the flag to be a "graven image." *Id.* at 629. That policy was unconstitutional because its effect was to "condition access to public education on making a prescribed sign and profession," contrary to the parents' religious beliefs, while the State "at the same time … coerce[d] attendance by punishing both parent and child." *Id.* at 630–31.

And in *Wisconsin v. Yoder*, the Court addressed a policy requiring students to attend school until age sixteen. 406 U.S. 205 (1972). Amish parents refused to send their children to school after eighth grade because they believed it would result in "impermissible exposure of their children to a 'worldly' influence in conflict with their beliefs." *Id.* at 211. The Court explained that for those students, school attendance would "plac[e] Amish children in an environment hostile to Amish beliefs" and "interpos[e] a serious barrier to the integration of the Amish child into the Amish religious community." *Id.* at 211–12. Thus, the policy was unconstitutional as applied to the Amish

14

because it violated the "fundamental interest of parents … to guide the religious future and education of their children." *Id.* at 232.

Just last year, the Court distilled further parents' rights to direct their children's religious instruction. In *Mahmoud*, parents challenged a school policy that required teachers to read "LGBTQ+-inclusive" books to students that were "unmistakably normative" and "present[ed] as a settled matter a hotly contested view of sex and gender that sharply conflicts with the religious beliefs [many] parents wish to instill in their children." 606 U.S. at 550, 553. Because the policy "with[e]ld notice and opt outs," it "unconstitutionally burden[ed]" parents' religious exercise. *Id.* at 545, 569.

*Mahmoud* clarifies that school policies that "substantially interfere with the religious development" of children must survive strict scrutiny. *Id.* at 565 (cleaned up). Though courts usually look to whether policies are neutral and generally applicable, for policies that impose burdens "of the same character as that imposed in *Yoder*," strict scrutiny applies. *Id.* at 564. And in *Mirabelli*, the Court found that gender transition was an even worse affront to the First Amendment than what was at stake in *Mahmoud*. *Mirabelli*, 607 U.S. at 496.

AACPS's policies (Policy JQ, the Guidance Document, and Regulation JQ-RA) mirror the policy in *Mirabelli*. Critically, AACPS policies allow the "unconsented facilitation of a child's gender transition." *Id.* Under Regulation JQ-RA, every student "has the right to be addressed by a name and pronoun that correspond to the student's gender identity," even if parents have a religious objection to their child being referred to with names and pronouns that do not correspond to their child's God-given sex. Ex. C at 2. And the Regulation does not require that the student's official record reflect the student's chosen name before using it in classrooms, seating charts, or otherwise. *Id.*

The same is true for student facility use and activities. Regulation JQ-RA mandates that students "who consistently demonstrat[e] and identif[y] with a specific gender identity shall have access to the school facilities that correspond with [their] gender identity." Ex. C at 3. This includes locker rooms, restrooms, and accommodations for overnight field trips and camps. The Regulation also permits students "to participate in physical education classes and intramural sports in a manner aligned with the student's gender identity." *Id.* at 4. So even if parents have a religious objection to their child's use of facilities or participation in activities that do not conform with the child's biological sex, AACPS policies provide that the student must be allowed to use the opposite-gender facilities.

Nowhere does Policy JQ, the Guidance Document, or Regulation JQ-RA require parental notification before schools facilitate a child's social transition. Instead, AACPS's policies permit staff to make "[c]ase-by-case decisions" about whether to notify parents regarding their child's in-school gender transition. Ex. A at 4. And AACPS personnel have confirmed that school staff do not have to consult parents before facilitating a child's transition. *See* John Doe Decl. ¶¶63–64; Jane Doe Decl. ¶¶63–64. In other words, AACPS's policies "conceal that information from parents" and effectively "shut [parents] out of participation in decisions regarding their children's" condition. *Mirabelli*, 607 U.S. at 496–97. And they do so indiscriminately, keeping *all* parents in the dark rather than simply "precluding gender-identity disclosure to parents who would engage in abuse." *Id.* at 497.

The policies also have no opt-out mechanism. *See Mirabelli*, 607 U.S. at 496 (faulting the exclusion policy for failing to provide "religious exemptions"). For many parents, including the Does, mere participation in a system that accepts and validates the self-selection of gender violates their religious beliefs. *Mahmoud*, 606 U.S. at 552; *see also* John Doe Decl. ¶17; Jane Doe Decl.

16

¶17. Such a system "places an unconstitutional burden on the parents' religious exercise if it is imposed with no opportunity for opt outs." *Mahmoud*, 606 U.S. at 568.

To be sure, AACPS's policies contemplate parental involvement in some situations, suggesting that school staff "work with a … student's parent(s)/guardian(s) to develop an appropriate plan to accommodate and support the student and their gender identity." Ex. C at 2. But even this provision fails to give parents a meaningful "role in some of the most consequential decisions in their children's lives." *Mirabelli*, 607 U.S. at 497. First, the provision makes the parent only one voice among many in the "support team," Ex. C at 2; it does not give parents the ability to "'*direct* the religious upbringing of their children'" by, for example, overriding the school's decisions when they conflict with the parents' deeply held religious beliefs, *Mahmoud*, 606 U.S. at 546 (emphasis added). Parents, however, are not mere partners with the state when it comes to raising their children. They have the "primary role" in their children's religious education. *Yoder*, 406 U.S. at 232. Second, the provision contemplates parental involvement only when the "student's parent(s)/guardian(s) … *support* the [student's] gender identity." Ex. C at 2 (emphasis added). In other words, it conditions parental involvement on acceptance of a practice that is "directly contrary to the religious principles that the parents in this case wish to instill in their children." *Mahmoud*, 606 U.S. at 552.

**2.** AACPS's policies violate the First Amendment on their face, which is sufficient on its own for the Does to establish likely success on the merits. *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 527 n.6 (W.D. Va. 2018). But they also violate the First Amendment as applied to the Does.

Like many others who "believe that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live accordingly," *Mahmoud*, 606 U.S. at 552, the Does sincerely believe that calling Mary by a male

17

name and male pronouns (which do not conform with her biological sex) is a lie, violates the teachings of their faith, and is a failure in their duty to raise her in their Christian faith, *see* John Doe Decl. ¶¶5–7, 10, 13; Jane Doe Decl. ¶¶5–7, 10, 13. And they believe that allowing Mary to use facilities and participate in gender-segregated clubs contrary to her biological sex would fail to honor the body that God gave her. *See* John Doe Decl. ¶¶6, 17; Jane Doe Decl. ¶¶6, 17. These beliefs "relate to 'the very architecture' of [the Does'] fait[h]." *Mahmoud*, 606 U.S. at 591 n.7 (Thomas, J., concurring) (citation omitted).

Under AACPS's policies, however, because Mary has expressed a desire to be referred to by a male name, her school is required to facilitate her social transition, the Does' contrary religious beliefs notwithstanding. And that is precisely what Mary's school did. Like the schools in *Mirabelli*, AACPS personnel discussed gender-identity issues with Mary and "referred to her using [a] male name … at school." 607 U.S. at 493. But "no one told the [Does] about their daughter's transitioning." *Id.* Everything was done "behind their backs." *Id.* at 494. Even after the Does discovered AACPS's deception and "confronted the school … about their daughter's transitioning," the school "continued to use a male name … for their daughter," "[c]ontrary to the [Does'] instructions." *Id.* The policies do not provide the Does with any ability to prevent further transitioning of Mary or to reverse the social transitioning that has already occurred.

For the Does, then, AACPS's policies "impose the kind of burden on religious exercise that *Yoder* found unacceptable" by interfering with their "sincere religious beliefs about sex and gender" and "religious obligation to raise their children in accordance with those beliefs." *Id.* at 496 (cleaned up). And just like in *Mirabelli*, AACPS's policies and actions "will likely not survive … strict scrutiny." *Id.* To do so, AACPS would need to demonstrate that they "advanc[e] 'interests of the highest order' and [are] narrowly tailored to achieve those interests." *Mahmoud*, 606 U.S.

18

at 565 (quoting *Fulton v. Philadelphia*, 593 U.S. 522, 541 (2021)). But AACPS can show neither. Its policies cannot serve a compelling interest in "student safety and privacy" by "cut[ting] out the primary protectors of children's best interest: their parents." *Mirabelli*, 607 U.S. at 496–97. And even if they could, that interest could be served through a narrower means that "allows religious exemptions while precluding gender-identity disclosures to parents who would engage in abuse." *Id.* at 497. To survive strict scrutiny, policies must give parents the ability to "have their children opt out of a particular educational requirement that burdens their well-established right 'to direct the religious upbringing of their children.'" *Mahmoud*, 606 U.S. at 568 (cleaned up). AACPS's policies fail this test.

> **C.**     **AACPS's policies violate the Fourteenth Amendment.**

For similar reasons, AACPS's policies violate the Due Process Clause, both facially and as applied to the Does.

**1.** "Under long-established precedent, parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli*, 607 U.S. at 497. And again, *Mirabelli* controls. As the Supreme Court confirmed there, parents have "the right not to be shut out of participation in decisions regarding their children's mental health," including "gender dysphoria." *Id.* (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979)).

The Fourteenth Amendment "guarantees more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). It also protects certain unenumerated but "fundamental rights and liberty interests," *id.* at 720, if those rights are "'deeply rooted in this Nation's history and tradition.'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022). And the "right of parents to make decisions concerning the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (collecting cases). In *Meyer v. Nebraska*, for

19

example, the Court recognized the rights of parents to "control the education of their own" children. 262 U.S. 390, 401 (1923). And in *Pierce v. Society of Sisters*, the Court held that Oregon could not compel parents to send their children to public schools instead of religious ones because doing so would "unreasonably interfer[e] with the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. 510, 534–35 (1925).

Children, to put it simply, are not "mere creature[s] of the state." *Id.* at 535. And the state is not a co-parent. Instead, "'[i]t is cardinal'" that "'the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" *Troxel*, 530 U.S. at 65–66.

It is equally clear that a parent's rights include the right to make decisions about their child's "need for medical care or treatment." *Parham*, 442 U.S. at 603; *see also Mirabelli*, 607 U.S. at 497 ("The right protected by these precedents includes the right not to be shut out of participation in decisions regarding their children's mental health."); *H.L. v. Matheson*, 450 U.S. 398, 410 (1981) (Parents' rights "presumptively includ[e] counseling [their children] on important decisions."). And that right does not disappear at school. Both *Meyer* and *Pierce*, for example, specifically considered parents' rights to control their children's education. Indeed, the right to manage one's "children would be an empty promise if it did not follow those children into the public school classroom." *Mahmoud*, 606 U.S. at 547.

The decision about how to respond to a child who expresses gender confusion strikes at the core of this parental authority. Gender identity implicates the most fundamental issues concerning a child, including religion, medical care, sense of self, and mental and emotional well-being. Many families hold the religious beliefs that sex is assigned by God, that sex and gender are inseparable, and that children should be taught to accept the bodies that God gave them. *See*

*id.* at 552. Moreover, gender dysphoria is a medical condition that significantly impacts a child's mental health, *see Mirabelli*, 607 U.S. at 497; *Skrmetti*, 605 U.S. at 502–03, where parents' roles are key because children "simply are not able to make sound judgments," *Parham*, 442 U.S. at 603.

But despite the "extensive precedent" making clear that parents must be involved in these decisions, *Troxel*, 530 U.S. at 66, AACPS leaves them in the dark. Policy JQ and its implementing documents deprive parents of their right to be informed of the actions AACPS is taking with respect to fundamentally important decisions concerning their child. The policies require staff to address students using "preferred name[s] and pronoun[s]" that "correspond to [a] student's gender identity," allow students to use opposite-sex facilities like bathrooms and locker rooms, and assign students to "physical education classes," "intramural sports," and "interscholastic athletics" based on gender identity. Ex. C at 2–4. And it lets them do so while "conceal[ing] that information from parents." *Mirabelli*, 607 U.S. at 497. But under *Mirabelli*, "parents" have "an affirmative constitutional right to be provided with any such information." *City of Huntington Beach*, 2026 WL 1785110 at *2.

Indeed, without that information, it is impossible for parents to make informed "decisions regarding their children's mental health." *Mirabelli*, 607 U.S. at 497; *see, e.g.*, *Kaltenbach*, 2025 WL 1147577 at *2 (Thapar, J., concurring) (parental-exclusion policies, through "deception," "stri[p]" parents "of that possibility"). AACPS's deceptive policies thus "likely violate" the Fourteenth Amendment. *Mirabelli*, 607 U.S. at 497.

Even if a school inadvertently tips its hand (as happened here) and parents learn that school staff have facilitated their child's gender transition, AACPS's policies still leave parents with no options. Under the policies, school staff do not require parental consent before facilitating a child's

21

transition. And as the Does' experience demonstrates, AACPS staff will continue to facilitate a student's transition—including by referring to the student using non-biological pronouns and names—even if a parent expressly instructs the staff to cease such behavior. *See, e.g.*, John Doe Decl. ¶¶36, 40–42, 56, 62, 64, 72–73, 79, 82. Parents, in other words, are totally "shut out of participation" in decisions surrounding their children's well-being, *Mirabelli*, 607 U.S. at 497, even if "there is no contention that" the parents are "'unfit'" or otherwise incapable of making such decisions, *City of Huntington Beach*, 2026 WL 1785110 at *4. That, again, "likely violate[s]" parents' due-process rights. *Mirabelli*, 607 U.S. at 497.

Even the policy provisions that suggest staff "*may*" reach out to parents about their children's gender identity fail to cure these problems. *See* Ex. A at 4 (emphasis added). To start, these provisions do not *require* notification and therefore do not satisfy the school's "affirmative" obligation to keep parents informed. *City of Huntington Beach*, 2026 WL 1785110 at *2; *see, e.g.*, Ex. A at 4 ("decisions regarding parent notification" are made on a "[c]ase-by-case" basis). In fact, the policies contemplate notification only if "parents" are "already … supportive of the student's gender identity." Ex. A at 4 (cleaned up); *see also* Ex. C at 2 ("School staff shall work with" a "student's parent(s)/guardian(s)" to "support" the student's "gender identity."). And even if parents are invited to "work with" school staff, the policies do not require school officials to defer to—or give any special weight to—the parents' judgement. *Contra Troxel*, 530 U.S. at 70 ("[S]pecial weight" must be given "to the parent's own determination."). And of course, the policies provide no mechanism for parents to opt out of the system altogether.

The government must afford a "presumption of validity" to parental decisions unless there is clear evidence to the contrary. *Id.* at 67–68 ("[T]here is a presumption that fit parents act in the best interests of their children."). It certainly cannot "shut out" parents altogether when their

22

children "exhibi[t] symptoms of gender dysphoria at school." *Mirabelli*, 607 U.S. at 497. AACPS may disagree with parents who choose to affirm their child's biological sex rather than their non-biological gender identity, but that does not give the district license to substitute its own judgment. *See Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) ("School officials have only a secondary responsibility" and may not "displace parents."). Nor can AACPS rely on a student's supposed desire to transition as itself a reason to cast aside parental rights. "[T]he power to make" such decisions "does not automatically transfer … from the parents to some agency or officer of the state" just "because the decision of a parent is not agreeable to a child." *Parham*, 442 U.S. at 603. Finally, AACPS's fear that some parents might react badly to learning about their child's desires does not justify hiding that information from all parents. *See id.* (The "notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition."); *Mirabelli*, 607 U.S. at 497 (explaining that a school could adopt a narrow policy that simply "preclud[es] gender-identity disclosure to parents who would engage in abuse").

**2.** For the same reasons, the policies also violate the Fourteenth Amendment as applied to the Does. Like many other parents, the Does want to be told whether Mary has made requests or expressed confusion about her gender before the school takes action regarding her gender identity. *See* John Doe Decl. ¶¶88–89; Jane Doe Decl. ¶¶88–89. And they want to be informed of any actions the school plans to take in response. *See* John Doe Decl. ¶90; Jane Doe Decl. ¶90. They certainly do not want "to be shut out of participation in decisions regarding their children's mental health." *Mirabelli*, 607 U.S. at 497.

But under AACPS policies, the school is not required to disclose any of this information to the Does and, in fact, has attempted to keep the Does ignorant of Mary's gender confusion and

23

the school's responsive actions. *See* John Doe Decl. ¶¶18, 77–82; Jane Doe Decl. ¶¶18, 77–82. Multiple AACPS staff members "have had … discussions with" their daughter "about gender-identity or gender-transition issues," *Parents 1*, 78 F.4th at 629, and "use[d] a male name … for their daughter," *Mirabelli*, 607 U.S. at 494, all without informing the Does or asking their permission. *See, e.g.*, John Doe Decl. ¶¶31–32, 34, 48–55. And AACPS has *continued* to refer to Mary using a male name despite the Does' repeated and unambiguous instruction to stop. *See id.* ¶¶35–36, 56, 60, 62, 67–68, 79, 82. In fact, AACPS administrators have specifically told the Does that the district's policies require staff to use a male name for their daughter regardless of the Does' preferences. *See id.* ¶¶62–64, 67–68, 72, 82.

In essence, AACPS has "cut out the primary protectors of [Mary's] best interests: [her] parents." *Mirabelli*, 607 U.S. at 496–97. As *Mirabelli* makes clear, AACPS's policies and its actions applying those policies against the Does infringe on the Does' rights to direct the upbringing of their child. The Does are likely to succeed on the merits of their Fourteenth Amendment claim. *Id.* at 497.

## II.    The remaining factors favor a preliminary injunction.

The remaining factors also counsel in favor of a preliminary injunction. The Does are suffering and will continue to suffer irreparable harm because their First and Fourteenth Amendment rights are being violated, and because no future compensatory relief could remedy the spiritual and emotional damages the Does have suffered and continue to suffer. "Because there is a likely constitutional violation, the irreparable harm factor is satisfied." *See Leaders of Beautiful Struggle*, 2 F.4th at 346; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Mirabelli*, 607 U.S. at 497 ("The denial of plaintiffs' constitutional rights during the potentially protracted [legal] process constitutes irreparable harm.").

24

The balance of the equities also favors preliminary relief. First, AACPS "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional." *Leaders of Beautiful Struggle*, 2 F.4th at 346 (quoting *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013)). Second, "it is well-established that the public interest favors protecting constitutional rights." *Id.* Perhaps most importantly, "children's safety is the overriding equity," and an injunction here "promotes child safety by guaranteeing fit parents a role in some of the most consequential decisions in their children's lives." *Mirabelli*, 607 U.S. at 497.

### III.    The Court should waive the Rule 65(c) security bond.

This Court has "'discretion'" under Rule 65(c) to reduce or "'waive the security requirement'" for a preliminary injunction. *CACI, Inc.-Fed. v. U.S. Navy*, 674 F. Supp. 3d 257, 281 (E.D. Va. 2023) (cleaned up). The Court should waive the bond requirement here because Defendants do not risk any significant financial expense or other "substantial hardship" from complying with the injunction, "constitutional rights are at issue," and the Does have a substantial likelihood of success on the merits. *Mendoza Palacios v. Mullin*, No. 26-cv-648, 2026 WL 933319, at *9 (D. Md. Apr. 7, 2026).

**CONCLUSION**

For these reasons, the Court should preliminarily enjoin Defendants from enforcing Policy JQ, the Guidance Document, and Regulation JQ-RA against the Does and their daughter.

Dated: July 17, 2026

Respectfully Submitted,

/s/ Ian Prior

Rachael C. T. Wyrick*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
rachael@consovoymccarthy.com

Ian Prior (Bar No. 30683)
Crystal Clanton*
Rachael Griffin*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE, Suite 231
Washington, D.C. 20003
(202) 964-3721
ian.prior@aflegal.org
crystal.clanton@aflegal.org
rachael.griffin@aflegal.org

*Admitted pro hac vice

Counsel for Plaintiffs

26

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I also served Defendants by certified mail, return receipt requested, and on opposing counsel via email, at the following addresses:

Gloria Dent, Dawn Pulliam, Robert Siklworth, Erica McFarland, Sarah J. McDermott, Dana Schallherim, Joanne Bache Tobin, and S.H.
  Members, Anne Arundel County Board of Education
2644 Riva Road
Annapolis, MD 21401

Dr. Mark T. Bedell
  Superintendent, Anne Arundel County Public Schools
2644 Riva Road
Annapolis, MD 21401

Katherine Smith
  Principal, Broadneck High School
1265 Green Holly Drive
Annapolis, MD 21409

Philip Casolo
  Assistant Principal, Broadneck High School
1265 Green Holly Drive
Annapolis, MD 21409

Lisa M. Snead
  General Counsel, Anne Arundel County Public Schools
lsnead@aacps.org

Dated: July 17, 2026

Respectfully Submitted,

/s/ Ian Prior
Ian Prior (Bar No. 30683)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE, Suite 231
Washington, D.C. 20003
(202) 964-3721
ian.prior@aflegal.org

27