**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JOHN and JANE DOE, | |
| *Plaintiffs*, | |
| v. | Case No. 1:26-cv-02690-RDB |
| GLORIA DENT, in her official capacity as a member of the Anne Arundel County Board of Education, et al., | |
| *Defendants*. | |

**DECLARATION OF JOHN DOE**

I, John Doe, declare and state the following:

1. I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called to testify as a witness, would competently testify to them.

2. I live within the boundaries of the school district known as Anne Arundel County Public Schools ("AACPS") and am the parent of two school-aged children.

3. One of my daughters, Mary Doe, is enrolled at Broadneck High School, an Anne Arundel County Public School.

4. My wife, Jane Doe, and I are practicing Christians who regularly attend church together with our children. I have consistently raised my children in my Christian faith.

5. I believe God made man and woman in his image and that complementary sexes reflect the image of God. I believe, based on Scripture and Christian teachings, that there are only two sex presentations, which are male and female. I believe that it is impossible to change our sex and that our sex was given to us by God for a reason. I do not believe gender is a coherent category

1

separate from sex. These beliefs govern my views on human nature, marriage, gender, sexuality, morality, politics, ethics, natural law, and social issues.

6.     I believe that a person's gender, which is synonymous with biological sex, is determined by that person's DNA, is fixed from conception, and cannot be changed because no medical intervention, hormone treatment, surgery, or social transition alters a person's DNA.

7.     I believe that rejection of one's biological sex is a rejection of the image of God within that person. I believe that to acknowledge or endorse that sex is altered is to speak against God and my beliefs. I believe that referring to another person using pronouns that do not correspond with their biological sex is harmful to that person because it is false.

8.     I acknowledge that gender dysphoria exists, but I believe that it is historically a rare condition. I believe there is a difference between gender dysphoria and a child's confusion about their gender, which can lead a child to adopt a different name, pronouns, clothing, and so forth. I do not believe my children can self-select their gender, claim a "gender identity" that conflicts with their biological sex, or participate in a social gender transition.

9.     I believe that issues of gender are sensitive issues that should be left to families to discuss and resolve, not to schools. These views stem from my sincerely held religious beliefs.

10.     I believe I have a duty to raise all my children, including Mary, in my religious tradition and teach them my religious beliefs.

11.     I also strongly believe that parents have the right to direct their children's upbringing.

12.     I am opposed to AACPS's acceptance, encouragement, and facilitation of students self-selecting genders and pronouns. I believe that to acknowledge or endorse that sex can be altered is to speak against God and my sincerely held religious and philosophical beliefs. I do not

support Defendants' adoption or enforcement of Policy JQ, the Guidance Document, or Regulation JQ-RA, and I strongly object to any attempt to apply these policies to my children or me.

13. Policy JQ and its implementing documents are antithetical to the religious pillars and teachings of my Christian faith. These policies endorse worldviews that directly conflict with my beliefs, including the alleged fluidity of sex and gender and a person's ability to self-select such identities.

14. I want to be informed if the school is assisting my children with a social transition. I want to receive this information without my child being the one to first tell me, and before the school takes any action to facilitate a social transition. But Policy JQ and its implementing documents require schools to facilitate a transition, regardless of whether I know or approve it.

15. I also want to exercise my fundamental right as a parent to guide my children's upbringing and to help them navigate any issues that might arise regarding their perceptions of their gender identity.

16. And I want to exercise my right to raise my children in accordance with my religious beliefs, including by educating them in those beliefs.

17. I do not want my children or myself to be subject to the policies outlined in Policy JQ and its implementing documents. I do not want my children to be called by names and pronouns that do not align with their biological sex, and I do not want them to use intimate spaces or participate in activities according to their supposed "gender identity." I do not want to participate in a "support team" designed to facilitate and encourage gender dysphoria in my children. I believe doing these things would be lying to my children and would go against my religious beliefs.

18. Under AACPS's gender transition policies, as described in Policy JQ, the Guidance Document, and Regulation JQ-RA, however, AACPS staff members have not only facilitated and

encouraged Mary's social gender transition at school, but have also displaced me in my role as decision-maker by school administrators who do not know Mary as well as I do.

19. Specifically, AACPS staff members are referring to Mary by a male name that they allege she self-selected.

20. My wife and I discovered AACPS's facilitation and encouragement of Mary's social gender transition only because two separate staff members inadvertently disclosed the use of Mary's "self-selected" male name.

21. On December 10, 2025, my wife and I received an email from an AACPS staff member stating that a food-based lab experiment would be conducted in one of Mary's classes the following day.

22. In that email, the staff member referred to Mary by a male name that is not Mary's legal name.

23. Approximately forty minutes after sending that email, we received a second email stating that the staff member wanted to recall the message.

24. Approximately ten minutes later, the staff member sent a third email identical to the first, except it substituted Mary's legal name for the male name.

25. Immediately following the third email, the staff member sent a fourth email stating, "I just realized I sent the email below to the wrong addresses."

26. My wife and I were familiar with Mary's classmates because Mary has attended the same school district since Kindergarten.

27. We knew there was no classmate with the male first name and our surname mentioned in the first email.

4

28.     We were alarmed by the staff member's email and suspected that material information was being withheld from us. We asked the staff member to contact us immediately.

29.     The next day, the staff member called us and admitted that the statements in the emails were false.

30.     The staff member told us that Mary had requested to be referred to by the male name used in the first email.

31.     The staff member explained that, at the beginning of the semester, the staff member approached each student individually, asked what name the student preferred to be called, and recorded the student's response. The staff member told us that this procedure had been performed with Mary and that Mary had asked to be referred to by the male name used in the first email.

32.     The staff member also admitted to having private, one-on-one meetings with each student to discuss preferred pronouns. The staff member stated that this meeting occurred separately from the inquiry regarding each student's preferred name.

33.     The staff member told us that school policy permitted all staff members to ask students for their preferred names and pronouns.

34.     When we asked for details about when these meetings with Mary had taken place and what was specifically discussed, the staff member refused to provide further information. The staff member stated that the school administration should be involved before any additional questions were answered. We agreed to involve the school administration.

35.     During that conversation, we stated unequivocally that Mary was to be referred to only by her legal name and by pronouns corresponding with her biological sex.

36.     We also stated that the school was to cease and desist from referring to Mary by the male name used in the staff member's first email.

37. After this phone conversation, we sent an email to the staff member summarizing the call and reiterating our demands regarding Mary's legal name and pronouns.

38. We also requested records and information, including the policy that permits teachers and staff to ask students for their preferred names and pronouns, the exact format used when asking those questions, any form or record used to document students' responses, and all information regarding what name and pronouns Mary asked to be called.

39. The staff member forwarded our email to the school administration. The school's assistant principal, Philip Casolo responded to us by email.

40. Assistant Principal Casolo stated that the "law requires teachers to honor the names and pronouns preferred by students" and that teachers receive training in state and federal laws and are directed to adhere to them. Casolo stated that the "law" and AACPS "policy" required the staff member and others to honor Mary's preferred name while in school.

41. Assistant Principal Casolo also stated that the staff member would not be required to provide us with the items we requested.

42. Assistant Principal Casolo specifically cited AACPS Regulation JQ-RA as the "policy" requiring these responses.

43. Assistant Principal Casolo indicated that Regulation JQ-RA was an AACPS regulation, not a school-specific rule, and that objections should be directed to the AACPS Central Office.

44. Notwithstanding Casolo's email, the staff member assured us that Mary would be referred to only by her legal name moving forward.

45. At that time, it was my understanding that this AACPS staff member was the only staff member who had referred to Mary by the male name.

46.     Because the staff member assured us that only Mary's legal name would be used moving forward, and because the class concluded a few weeks later in January 2026, I believed the matter had been resolved.

47.     On May 1, 2026, my wife and I received an email from another AACPS staff member regarding an upcoming off-campus field trip. The email was sent to all parents of students attending the field trip.

48.     The email attached a document with logistical details and a breakdown of students organized by chaperone group. Mary was not listed in that breakdown. The same male name used in the December 2025 email was, however, listed with our surname.

49.     We immediately responded to the email and requested that the staff member call us as soon as possible. Later that evening, the staff member called us.

50.     When we stated that we did not see Mary's name on the student list, the staff member claimed Mary had been accidentally omitted.

51.     When we asked about the student listed with the male name and our surname, the staff member stated that this was another student in the class who shared our surname.

52.     We told the staff member that we knew this explanation was false because we were familiar with students in Mary's graduating class and knew there was no child with that specific male name who also shared our surname.

53.     After being confronted, the staff member admitted that there was no student with that male name and that the male name on the list was meant to refer to Mary.

54.     The staff member stated that Mary had asked to be referred to by that male name in class.

55.    The staff member also stated that school policy permits staff members to ask students for their preferred names and pronouns.

56.    We told the staff member that we were exercising our parental rights and that Mary was not to be referred to by anything other than her legal name under any circumstances.

57.    We also informed the staff member that Mary would no longer be attending the field trip because the staff member's dishonesty had destroyed any trust we might have placed in that staff member to supervise Mary on an off-campus excursion. We requested a refund of the field trip expenses we had paid.

58.    The staff member apologized to us, affirmed that Mary would be referred to only by her legal name moving forward, and agreed to inquire about a refund.

59.    Two weeks passed without any additional correspondence from the staff member.

60.    On May 18, 2026, we emailed the staff member, summarized our May 1 phone conversation, reiterated that Mary should be referred to only by her legal name, and requested an update on the field trip refund.

61.    In that email, we also made several record and information requests concerning Mary's name, pronouns, gender identity, and any related communications or documentation.

62.    Later that day, Assistant Principal Casolo called us. Casolo reiterated that the school was following the "law" and "policy," specifically Regulation JQ-RA, when referring to Mary by the male name. Casolo also stated that no refund would be issued for the field trip.

63.    We responded that Regulation JQ-RA requires school staff to work with a student and the student's parents to develop an appropriate plan to accommodate and support a student suffering from gender dysphoria unless there is a genuine concern for the student's safety. We told

Assistant Principal Casolo that no one from AACPS had attempted to contact us to develop such a "support plan."

64.     Assistant Principal Casolo claimed that this portion of Regulation JQ-RA did not apply to high school students and stated that the parties would just "continue to go around and around" on the issue and that there was nothing further the high school administration could do to address our concerns. Assistant Principal Casolo recommended that we raise our concerns directly with the assistant superintendent. We asked Casolo to initiate the meeting with the assistant superintendent.

65.     After that conversation, we emailed Assistant Principal Casolo summarizing our conversation, the two incidents in which Mary had been referred to by a male name, and our records and refund requests.

66.     In that email, we stated that the school's actions and treatment of Mary conflicted with our sincerely held religious beliefs.

67.     We reiterated that we did not consent to the use of any preferred names for Mary.

68.     Assistant Principal Casolo responded that the high school administration had contacted AACPS Central Office regarding our concerns and that Central Office confirmed the school's compliance with AACPS regulations. Casolo also stated that any appeal must first be filed with the high school principal, Katherine Smith, before it could be elevated further.

69.     We forwarded the email chain to Principal Smith and asked the principal to address our questions and requests.

70.     On May 19, 2026, Principal Smith confirmed receipt of our email and formal appeal and stated that a response would be provided within ten school days. Smith did not respond within ten school days.

71.    On June 5, 2026, we emailed Principal Smith , noted that eleven school days had passed, and requested an update.

72.    The following day, Principal Smith responded to our requests. Smith denied our refund request, stated that Regulation JQ-RA requires students to be addressed by their preferred names and pronouns while at school, and stated that staff members are trained and expected to honor students' preferred names and pronouns in the school setting.

73.    Principal Smith stated that the regulation's reference to "working with parents" means that school staff may help families navigate conversations and determine the best way to support students while maintaining a safe and inclusive learning environment.

74.    Principal Smith also stated that Mary's legal documents and official school records had not been changed and that Mary's legal name remains reflected in official AACPS systems and records.

75.    In response to our records request, Principal Smith stated that we could schedule an appointment to review Mary's educational records in accordance with FERPA.

76.    Principal Smith also stated that requests for internal emails, personal notes, or other staff communications would require "appropriate legal process, including a subpoena where applicable."

77.    No AACPS staff member ever intentionally informed us that Mary had requested to be referred to by a male name.

78.    No AACPS staff member ever asked for our permission to refer to Mary by a male name.

79.    AACPS staff members have referred to Mary by a male name without our knowledge or consent and continue to do so.

80. AACPS staff members concealed information from us regarding Mary's request to be referred to by a male name.

81. AACPS staff members made false or misleading statements to us when we asked about Mary's name and related school records.

82. AACPS continues to cite Regulation JQ-RA as justification for refusing to comply with our demands that Mary be referred to only by her legal name at school.

83. I do not want Mary to be subject to any AACPS policy or practice—including but not limited to Policy JQ, the Guidance Document, and Regulation JQ-RA—that facilitates or affirms a social gender transition without my knowledge and consent.

84. I want Mary to be referred to at school only by her legal name.

85. I want Mary to be referred to by pronouns corresponding with her biological sex.

86. I want Mary to use restrooms, locker rooms, overnight accommodations, and other sex-segregated facilities corresponding with her biological sex.

87. I want Mary to participate in physical education classes, intramural sports, school activities, field trips, and any other sex-separated school programming in accordance with her biological sex.

88. I want to be notified before AACPS or any AACPS employee takes any action to facilitate, affirm, or support any social gender transition by Mary.

89. I want access to all records, notes, emails, forms, communications, and other documentation reflecting any request by Mary to be called by a different name or pronouns or otherwise concerning Mary's gender identity, gender expression, or social transition at school.

11

90. I want the ability to opt Mary out of any AACPS policy or practice that facilitates or affirms a student's gender transition at school or withholds information from parents regarding such matters.

91. Under AACPS's policies, I have no way to know whether additional actions have been taken to facilitate Mary's social gender transition at school, including the use of preferred pronouns or access to restrooms, locker rooms, field-trip accommodations, or other activities aligned with a gender identity different from her biological sex.

92. Under AACPS's policies, school staff are required to accept Mary's request to be referred to by a male name and facilitate her social gender transition without our knowledge or consent.

93. Under AACPS's policies, our repeated demands that Mary be referred to only by her legal name have been ignored or denied.

94. AACPS's policies have caused me significant emotional distress, anxiety, and fear over Mary's well-being, mental health, and spirituality.

95. I face an ongoing daily risk that AACPS will continue facilitating Mary's social gender transition without my knowledge or consent.

96. AACPS's policies interfere with my ability to direct Mary's upbringing, education, care, mental health, and religious development.

97. AACPS's policies prevent me from receiving material information necessary to exercise my parental rights in an informed and meaningful way.

98. AACPS's policies prevent me from raising Mary in accordance with my sincerely held Christian beliefs.

99. I want AACPS to stop referring to Mary by any name other than her legal name.

100.    I want AACPS to stop facilitating any social gender transition by Mary without my knowledge and consent.

101.    I want AACPS to provide my wife and me with timely notice of any gender-related confusion Mary has experienced, or may experience in the future, before AACPS takes any action to facilitate my daughter's gender transition.

102.    I want AACPS to provide me with a religious exemption from this policy, allowing me to opt out of its application to my daughter.

103.    I want AACPS to provide my wife and me with complete access to all of Mary's educational records, including any records reflecting the use of a name or pronouns other than those consistent with Mary's legal name and biological sex.

104.    I want to be able to protect Mary, guide her, and make decisions concerning her well-being consistent with my parental rights and religious beliefs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 17th day of July, 2026                    [Signature on file with Plaintiffs' counsel]