**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JOHN and JANE DOE,
*Plaintiffs,*

v.

MARK BEDELL, et al.,

*Defendants.*

Case No. 1:26-cv-02690-RDB

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12(b)(1) & (6)**

Mary Rohmiller (Bar No. 32576)
Alice W. Yao (Bar No. 32573)
Teresa Alutto-Schmidt (Bar No. 28367)
Susan V. Metcalfe*
POTOMAC LAW GROUP, PLLC
1717 Pennsylvania Avenue, NW, Suite 1025
Washington, DC 20006
Telephone: (202) 713-9380
mrohmiller@potomaclaw.com
ayao@potomaclaw.com
taluttoschmidt@potomaclaw.com
smetcalfe@potomaclaw.com

** Admitted pro hac vice*

*Counsel for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............ iii

INTRODUCTION ............ 1

STATEMENT OF FACTS ............ 2

I. THE AACPS POLICIES REQUIRE PARENTAL INVOLVEMENT ............ 2

II. THE ALLEGATIONS REGARDING MARY ............ 3

III. INTERVENING DEVELOPMENTS ALTERING THE LEGAL LANDSCAPE ............ 5

STANDARDS OF REVIEW ............ 6

ARGUMENT ............ 7

I. THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THE DOES' COMPLAINT ............ 8

A. The Does' As-Applied Claims Are Moot ............ 8

B. The Does Lack Article III Standing to Facially Challenge the Policies ............ 12

C. The Does' Claims Are Not Ripe for Judicial Review ............ 18

II. THE DOES FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED ............ 18

A. The Regulation Requires Parental Involvement—The Does' Characterization Is Belied by the Plain Text ............ 19

B. The Does' Free Exercise Claim Fails as a Matter of Law ............ 20

C. The Substantive Due Process Claim Fails as a Matter of Law ............ 22

D. The Does' Facial Challenge to the Policies Fails ............ 26

III. THE CLAIMS AGAINST DR. BEDELL AND THE INDIVIDUAL BOARD MEMBERS SHOULD BE DISMISSED ........ 27

IV. THE CLAIMS AGAINST PRINCIPAL SMITH AND ASSISTANT PRINCIPAL CASOLO SHOULD BE DISMISSED ........ 29

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) .......... 18

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) .......... 8, 9, 11, 15

*Anspach ex rel. Anspach v. City of Phila.*, 503 F.3d 256 (3d Cir. 2007) .......... 24

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) .......... 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 7, 19, 28

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 7

*California v. Texas*, 593 U.S. 659 (2021) .......... 29

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) .......... 20

*City of Huntington Beach v. Newsom*, No. 25-3826, 2026 WL 1785110 (9th Cir. June 18, 2026) .......... 17

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) .......... 14

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) .......... 24

*Diffenderfer v. Central Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412 (1972) (per curiam). 11

*Disability Rights S.C. v. McMaster*, 24 F.4th 893 (4th Cir. 2022) .......... 29

*Doe v. Pine Richland School District*, No. 24-3348, 2026 WL 1103489 (3d Cir. Apr. 23, 2026) .......... 17, 27

*Evans v. B.F. Perkins Co.*, 166 F.3d 642 (4th Cir. 1999) .......... 6

*Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025) .......... 23, 24, 25

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .......... 8, 9

*Frudden v. Pilling*, 877 F.3d 821 (9th Cir. 2017) .......... 21

*Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159 (4th Cir. 2016) .......... 6, 19

*John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622 (4th Cir. 2023) . passim

*Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733 (4th Cir. 2024) .......................................... 20

*Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003) ............................................................ 25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................. 12

*Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003) ......................................................................... 20, 23

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) .............................................................................. 21, 27

*McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582 (4th Cir. 2015)..................................... 7

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .................................................................................... 3

*Mirabelli v. Bonta*, 607 U.S. 492 (2026) ............................................................................ passim

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)....................................................................... 26

*Murphy v. Hunt*, 455 U.S. 478 (1982) (per curiam) .................................................................... 8

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003) ....................................... 18

*New York v. Ferber*, 458 U.S. 747 (1982) ................................................................................. 21

*Parents Protecting Our Children, UA v. Eau Claire Area School District*, 95 F.4th 501 (7th Cir. 2024) ................................................................................................................................ 14

*Perry v. Marteney*, 172 F.4th 315 (4th Cir. 2026) ..................................................................... 20

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ...................................................................... 24

*Porter v. Clarke*, 852 F.3d 358 (4th Cir. 2017) .............................................................. 9, 10, 11

*Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262 (4th Cir. 2013) .......................... 18

*Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994) ....................................................................... 28, 29

*South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019)................................................. 18

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)................................................. 12, 18

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)......................................................... 16

*Troxel v. Granville*, 530 U.S. 57 (2000) ........................................................................ 3, 24

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) ........................................................................ 11

*Washington State Grange v. Washington State Republican Party,* 552 U.S. 442 (2008) ............ 26

*Wells v. Johnson*, 150 F.4th 289 (4th Cir. 2025) ........................................................................ 9

*White Tail Park, Inc. v. Stroube*, 413 F.3d 451 (4th Cir. 2005)................................................ 6, 8

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ........................................................................ 24

**Statutes**

Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g ......................... passim

Md. Code Ann., Educ. § 3-102 ........................................................................ 1

Md. Code Ann., Educ. § 3-103 ........................................................................ 1

Md. Code Ann., Educ. § 3-104 ........................................................................ 1

Md. Code Ann., Educ. § 3-2A-06 ........................................................................ 28

Md. Code Ann., Educ. § 4-101 ........................................................................ 1

Md. Code Ann., Educ. § 4-108 ........................................................................ 1

Md. Code Ann., Educ. § 6-201 ........................................................................ 28

Md. Code Ann., Educ. § 6-202 ........................................................................ 28

**Other Authorities**

Glisten, *The 2025 National School Climate Survey: School Experiences of LGBTQ+ Youth in the U.S.* (2026), https://glisten.org/nscs2025/ ........................................................................ 21

Maryland State Dep't of Educ., *Safe and Supportive Schools for All Students: Creating Inclusive Spaces for LGBTQIA+ Youth* (Apr. 2026), https://marylandpublicschools.org/about/documents/dsfss/sssp/lgbtqia-guidance-a.pdf ......... 21

Maryland State Dep't of Educ., *Supporting LGBTQIA+ Students: Resources for Maryland Schools*, https://marylandpublicschools.org/about/pages/dsfss/lgbtqia+.aspx ........................ 21

Russell B. Toomey et al., *Transgender Adolescent Suicide Behavior*, 142 Pediatrics e20174218 (2018)........................................................................................................................ 21

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ...................................................................... 6, 7

Federal Rule of Civil Procedure 12(b)(6) ............................................................... 7, 18, 27

**Regulations**

Md. Code Regs. 13A.02.01.01 ........................................................................................ 28

Md. Code Regs. 13A.08.02 ............................................................................................. 10

**Constitutional Provisions**

U.S. Const. art. III, § 2, cl. 1 .......................................................................................... 8

## INTRODUCTION

This case is about a name. A high school student (pseudonymously, Mary Doe) told her teachers she preferred to go by a name other than her legal name. Two teachers used that name. Her parents found out through emails from her teachers, and they objected. The school agreed to use Mary's legal name, and a Consent Order now requires Anne Arundel County Public Schools (AACPS)[1] to use only her legal name, notify her parents of any future name or pronoun request, and involve them in any future discussions regarding her name or pronouns. That is the entire factual predicate for this lawsuit, and the dispute arising from it has been fully resolved.

This case is *not* about a school district concealing a child's gender transition from her parents, or a local board of education policy that excludes parents from decisions about their children. Nor is it about medical treatment, transgender health care, or other states' policies that categorically excluded parents from their children's social transitions—policies fundamentally unlike those here, despite the complaint's extended discussion of them. The complaint does not allege that Plaintiffs' daughter is transgender or considering living as a boy, sought to use male pronouns, requested a gender support plan or any accommodations, or gave her teachers any indication that she was considering a social transition. It alleges only that Mary told her teachers she wanted to use a name other than her legal name.

Based on that single, resolved disagreement over Mary's name, the Does ask this Court to strike down an entire framework of student-protection policies as unconstitutional. Not because the policies injured them, but because they disagree with the policies on principle. However, a policy dispute alone does not confer standing, "[a]nd policy disagreements should be addressed .

[1] AACPS is the name used by the county school system that is governed by the Board of Education of Anne Arundel County (the "Board"). Md. Code Ann., Educ. §§ 3-102 to 3-104, 4-101, 4-108. The Amended Complaint names individual Board members among the defendants but not the Board itself.

. . at the ballot box," not "the jury box." *John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 626, 636 (4th Cir. 2023) (*Parents 1*).

There is also a fundamental mismatch between the policies the Does challenge and the injury they allege. The Does target three AACPS policy documents: Board Policy JQ, Regulation JQ-RA, and the 2019 Guidance Document (collectively, the AACPS policies). The Does cast these policies as a framework for concealing children's gender transitions from their parents, but their text shows they were designed to accomplish two goals: ensuring that all AACPS students can attend school in a safe and supportive environment and that parents are meaningfully involved in decisions about their children. Regulation JQ-RA, the regulation at the center of this case, expressly requires school staff to "work with a student and the student's parent(s)/guardian(s) to develop an appropriate plan" regarding gender identity.

The Court should dismiss this action in its entirety. The Does' as-applied claims are moot. They lack standing to press a facial challenge. Their speculative claims are unripe. And even if the Court were to reach the merits, the complaint fails to state a claim: the policies are neutral and generally applicable, the regulation requires parental involvement rather than excluding it, and the Does' own requested relief—striking down the AACPS policies—would eliminate the very parental-involvement protections they claim to want.

## STATEMENT OF FACTS

### I. THE AACPS POLICIES REQUIRE PARENTAL INVOLVEMENT

The Does characterize AACPS's policies as a covert system designed to exclude parents. The policies say the opposite. The Amended Complaint challenges three AACPS policy documents: (1) a 2019 guidance document, "Students and Gender Identity: Guidelines for Support," which provided administrative guidance to staff; (2) Policy JQ, a board-level policy

adopted in June 2021; and (3) Regulation JQ-RA, the implementing regulation adopted alongside Policy JQ and most recently revised on August 18, 2026. (Yao Decl. ¶¶ 3, 4, 6, Exs. A, B, E.)

Far from excluding parents, Regulation JQ-RA is built on parental involvement:

> School staff shall work with a student and the student's parent(s)/guardian(s) to develop an appropriate plan to accommodate and support the student and their gender identity, unless there is a genuine safety concern for the student's physical, emotional, or mental health safety as determined by the principal or the principal's designee.

The text is unambiguous: staff "shall work with" parents to develop accommodation plans related to student gender identity. The safety exception is narrow and is designed to protect children at risk of abuse or abandonment and to comply with Maryland's mandated reporter obligations, not to facilitate secrecy. (Yao Decl. ¶ 4, Ex. B.)

Board Policy KH and its implementing Regulation KH-RA reinforce this commitment. Policy KH recognizes "the important responsibility parents/guardians have in guiding their children's upbringing" and designates parents as "full partners in the decisions that affect children and families." (Yao Decl. ¶ 5, Exs. C, D.) These documents are part of the foundation on which many AACPS regulations—including JQ-RA—operate, and together they treat parents as partners and require their involvement in any accommodation decisions, consistent with their constitutional right to control the upbringing and education of their children. *See, e.g.*, *Mirabelli v. Bonta*, 607 U.S. 492, 496–97 (2026); *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923).

## II. THE ALLEGATIONS REGARDING MARY

The factual allegations center on two incidents, both involving classroom name usage. In December 2025, a staff member sent the Does an email that referred to Mary by a name other than her legal name. The staff member initially offered an inaccurate explanation but then acknowledged that Mary had provided the name in response to a routine classroom practice in

which each student was asked what name they preferred. First Am. Compl. ¶¶ 78–88 (ECF 13). The Does demanded that staff use only Mary's legal name, and the staff member assured them it would be used. *Id.* ¶¶ 92–93, 99. The Does believed the matter resolved. *Id.* ¶ 99.

Five months later, in May 2026, a different staff member sent a field trip email listing Mary under her requested name. This staff member likewise offered an inaccurate explanation[2] before acknowledging that the name referred to Mary. *Id.* ¶¶ 100–06. The Does again demanded the use of Mary's legal name and submitted records requests. *Id.* ¶¶ 107–110.

What matters most for this motion is what the Does' complaint does *not* allege. It does not allege that Mary approached any school official about her gender identity. It does not allege that she requested male pronouns, sought formal accommodations, or asked for a gender support plan. It does not allege that any such plan was developed or implemented. And it does not allege that Mary accessed boys' facilities, participated on boys' sports teams, changed her manner of dress, or "consistently demonstrate[d] and identifie[d] with" a male gender identity. (Yao Decl. ¶ 4, Ex. B.) No formal accommodation under Regulation JQ-RA was ever triggered, requested, or implemented. The entire factual predicate for this complaint is that Mary gave a name other than her legal name in response to a routine classroom question, and two staff members used it. The Does allege they "are concerned" that additional steps may be taken in the future, First Am. Compl. ¶ 132, but those are statements of apprehension, not allegations that the feared events have occurred, and they have been fully addressed by the intervening developments.

---

[2] While Defendants may dispute specific allegations surrounding staff members' actions and communications, as well as the Does' claim that such actions follow or reflect Board policies and AACPS practices, these allegations are accepted for the purposes of this motion. Further, as discussed below, such alleged staff conduct, to the extent it occurred, has been resolved by the aforementioned Consent Order.

## III. INTERVENING DEVELOPMENTS ALTERING THE LEGAL LANDSCAPE

Three developments since the Amended Complaint was filed bear directly on this motion.

**1. The Consent Order:** On August 7, 2026, the Court entered the Consent Order resolving the Does' amended motion for preliminary injunction. ECF 48. For the pendency of this litigation, Defendants agreed that they shall (1) not enforce Policy JQ, the Guidance Document, or Regulation JQ-RA—or any materially similar AACPS policy, regulation, or guidance document—as to the Does or Mary; (2) refrain from referring to Mary by any name other than her legal name; and (3) provide the Does with timely notice of, and the opportunity to opt out of, any new or revised school policy or practice relating to gender transition, and shall not withhold from the Does information known to them relating to any future expression of interest in or efforts by Mary to engage in gender transition. Consent Order ¶¶ 1–3. Defendants offered to extend these terms through Mary's graduation or eighteenth birthday, regardless of the litigation's timeline; the Does rejected that offer. (Yao Decl. ¶¶ 10–11.) Even so, the Consent Order has remediated every concrete injury the Does allege as to Mary.

**2. The Amended Regulation and Superintendent's Directive:** On August 18, 2026, AACPS amended Regulation JQ-RA to expressly protect parents' rights to inspect and review their child's education records. (*Id.* ¶ 12, Ex. B.) The amended regulation now provides that "[n]othing in this regulation shall be construed to limit or otherwise interfere with parents'/guardians' rights under FERPA [the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g], including the right to inspect and review their student's complete education record." (*Id.*) It further clarifies that "[u]nder FERPA, education records generally include all records, files, documents, and other materials maintained by AACPS that contain information directly related to a student." (*Id.*)

These amendments followed the Department of Justice's inquiry into AACPS's FERPA practices. AACPS amended the regulation to eliminate any possible ambiguity about parental access rights and to make clear that parents may inspect and review all education records—including any records related to gender identity—upon request. Superintendent Bedell publicly reinforced AACPS's commitment to FERPA compliance by confirming that "no policy, guideline, or practice may limit or otherwise interfere with parental rights under FERPA, and this includes any information maintained in education records that relates to gender identity, transgender status, sexual orientation, preferred name, or preferred pronouns." (*Id.* ¶ 13, Ex. I).

**3. The 2019 Guidance Document.** The 2019 Guidance Document is no longer being enforced by AACPS. (*Id.* ¶¶ 6, 15, Ex. E; Snead Decl. ¶ 3.) To the extent the Does' claims rest on the Guidance Document, they challenge a policy that AACPS has already ceased to apply to all of its students.

## STANDARDS OF REVIEW

A motion under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction. The plaintiff bears the burden of establishing that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). When a defendant challenges subject matter jurisdiction, the district court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.*; *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459–60 (4th Cir. 2005) (relying on affidavits outside the complaint to resolve Rule 12(b)(1) standing challenge); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) ("[W]e may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity.").

A motion under Rule 12(b)(6) tests the legal sufficiency of the complaint. To survive, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Merely leaving "open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery" is not enough. *Id*. at 561 (citation modified); *see also McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 587 (4th Cir. 2015). The court must accept well-pleaded factual allegations as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), but "naked assertions devoid of further factual enhancement" do not suffice. *Id.* at 678 (citation modified) (quoting *Twombly*, 550 U.S. at 557); *McCleary-Evans*, 780 F.3d at 585.

**ARGUMENT**

The Court should dismiss this case for two independent reasons. First, under Rule 12(b)(1), the Court lacks subject matter jurisdiction. The Does' as-applied claims are moot: the Consent Order already provides every form of individualized relief they sought, and Defendants offered to extend it through Mary's remaining enrollment—an offer the Does rejected. Their facial challenge fails for lack of standing: the Does have suffered no injury traceable to the policies themselves, only to alleged staff conduct. And their claims are unripe: no formal accommodation has been requested or provided, and any future injury remains speculative.

Second, under Rule 12(b)(6), even if the Court has jurisdiction, the complaint fails to state a claim. The Does' Free Exercise claim fails because the regulation is neutral and generally applicable, triggering only rational-basis review. Their substantive due process claim fails because the regulation requires—rather than prohibits—parental involvement, and no court has recognized a constitutional right to affirmative notification of every student-initiated classroom

interaction. And their facial challenge fails because the regulation is constitutional in all or substantially all of its applications.

Each of these defects independently warrants dismissal.

## I. THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THE DOES' COMPLAINT

### A. The Does' As-Applied Claims Are Moot

Article III of the Constitution limits federal courts' jurisdiction to actual "[c]ases" and "[c]ontroversies," and that controversy must remain live "'at all stages of review, not merely at the time the complaint is filed.'" U.S. Const. art. III, § 2, cl. 1; *White Tail Park*, 413 F.3d at 457 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). "A case becomes moot"—and must be dismissed for lack of subject matter jurisdiction—"when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation modified) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). When challenged conduct has ceased, the defendant must show that "'it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id*. (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). The mootness doctrine ensures that federal courts do not issue advisory opinions or expend judicial resources on disputes that have ceased to exist. *See Friends of the Earth*, 528 U.S. at 191.

#### 1. <u>The Consent Order provides complete individualized relief.</u>

The Consent Order provides the Does all the individualized relief they sought: it directs AACPS staff to refer to Mary by her legal name and female pronouns, ensures the Does receive notice of any future name or pronoun request, and guarantees their involvement in any gender-support planning. When a plaintiff has received all the relief that could be available, the case is

moot. *See Already, LLC*, 568 U.S. at 91. And Defendants offered to extend that relief through the rest of Mary's AACPS enrollment. Because the Does can obtain no further individualized relief, their as-applied claims no longer present a live case or controversy.

The complaint's prayer for relief confirms the point: the Does ask this Court to bar enforcement of the AACPS policies against Mary, prohibit staff from using any name other than her legal name, and require timely notice and opt-out rights for any gender-transition policy. First Am. Compl. at 32–33. The Consent Order does all three. Consent Order ¶¶ 1–3. That leaves only a declaratory judgment, nominal damages, and attorneys' fees. But a declaratory judgment that adds nothing to the injunctive relief already in place serves no Article III purpose. *See Wells v. Johnson*, 150 F.4th 289, 301 (4th Cir. 2025) (holding that a declaratory judgment redresses an Article III injury only when its preclusive effect is likely to produce a tangible litigation-related benefit, because "[w]ithout preclusive effect, a declaratory judgment is little more than an advisory opinion" (quotation omitted)). And nominal damages, as discussed below, cannot keep alive a claim for prospective relief when that relief has already been granted.

The voluntary-cessation doctrine does not save the Does' claims. That doctrine guards against "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (citation omitted). But a consent order is categorically different from a unilateral policy change: it is an enforceable federal court order and violating it would expose Defendants to contempt. *See Friends of the Earth*, 528 U.S. at 189. And Defendants' offer to extend the Consent Order's protections through the end of Mary's enrollment eliminates any concern that the relief is tactical; a defendant who offers permanent relief cannot plausibly be accused of "immunizing itself from suit indefinitely." *Porter*, 852 F.3d

at 364. The Does' refusal to accept complete, permanent relief suggests that what they seek is not individualized protection but a judicial declaration invalidating AACPS's policies—relief that Article III does not permit absent a live controversy.

2. The Amended Regulation independently moots the information-access claims.

The August 2026 amendments to Regulation JQ-RA independently moot the Does' facial claim that AACPS's policies denied them access to information about their daughter. Section D.4.d now expressly provides that "[n]othing in this regulation shall be construed to limit or otherwise interfere with parents'/guardians' rights under FERPA, including the right to inspect and review their student's complete education record." (Yao Decl. ¶ 12, Ex. B.) The Superintendent's August 19, 2026, message to staff and AACPS families confirms that no AACPS policy, guideline, or practice may interfere with those rights. The regulation's text now expressly protects the very access the Does allege was denied, leaving no live controversy on this aspect of their claims. (*Id.* ¶ 13, Ex. I.)

The amendment also defeats any voluntary-cessation concern. Unlike the defendants in *Porter*, who refused to rule out a return to the challenged policies, 852 F.3d at 365, AACPS has made its commitment to FERPA compliance clear. The amendment was prompted by the Department of Justice's review of AACPS's FERPA practices, and AACPS chose to amend Regulation JQ-RA to eliminate any possible ambiguity about parental access rights consistent with existing policy and law[3]—not to evade judicial review. A clarifying amendment adopted to remove confusion about existing legal obligations is the opposite of the tactical, easily reversible

[3] AACPS's commitment to FERPA rights and protections is longstanding, as reflected in the Board's student records policy and the supporting regulation. *See* Policy JH and Regulation JH-RA. (Yao Decl. ¶ 7, Exs. F, G.). These procedures have been in place for decades consistent with federal law and the concomitant regulations of the Maryland State Board of Education. *See* Md. Code Regs. 13A.08.02.

conduct the voluntary-cessation doctrine targets. *See id.* at 364 (doctrine guards against defendants who alter "'behavior long enough to secure a dismissal and then reinstat[e] it immediately after'" (citation omitted)). Even if the amendment could be framed as "at least somewhat related" to this litigation, *id.* at 364 n.3 (citation omitted), that actually supports mootness here, not undermines it. The Does' as-applied claims thus target conduct that has been resolved by Consent Order and regulatory amendment alike.

3. The 2019 Guidance Document has been withdrawn.

Finally, the Does' claims based on the 2019 Guidance Document are moot because AACPS has withdrawn it. A case loses its character as a live controversy when the challenged policy has been repealed. *See Diffenderfer v. Central Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412, 414–15 (1972) (per curiam). Here, the withdrawal is not merely a paper change: the Superintendent's August 19, 2026, directive to staff and families confirms that AACPS's operational practices align with the amended regulation, including the requirement to involve parents when a student seeks a gender support plan. (Yao Decl. ¶ 13, Ex. I.) This is not a case "capable of repetition, yet evading review." *Diffenderfer*, 404 U.S. at 414 (citation omitted). The 2019 Guidance Document no longer applies to any student; it exists only as a historical artifact.

4. Nominal damages and redressability cannot revive moot claims.

The nominal damages sought in the complaint do not save the Does' as-applied claims. The Supreme Court has held that "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021). Even assuming the Does could establish a completed constitutional injury (which, as discussed below, they cannot), redressability alone does not defeat mootness where the plaintiff has already received all the relief a court could provide. *See Already, LLC*, 568 U.S. at 91. A nominal damages award, which vindicates past

violations, does not save forward-looking relief that the Consent Order has already granted. What remains—a challenge to the policies themselves—is a facial challenge.

The Does' requested relief also presents an independent redressability problem. The Does ask this Court to declare unconstitutional and permanently enjoin the very policies that contain the parental-involvement protections they claim to want. Regulation JQ-RA requires staff to "work with a student and the student's parent(s)/guardian(s) to develop an appropriate plan." (Yao Decl. ¶ 4, Ex. B.) If the Court struck down these policies, AACPS would be left with *no* regulation requiring parental involvement in gender-identity matters at all. The Does would have less protection, not more. A plaintiff cannot establish Article III redressability by seeking relief that would make the plaintiff worse off. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (relief must "likely" redress the alleged injury).

**B. The Does Lack Article III Standing to Facially Challenge the Policies**

Even setting aside mootness, the Does lack standing to press their facial challenge. To establish Article III standing, a plaintiff must demonstrate an injury in fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). The Fourth Circuit applied this standard in *Parents 1*, and its decision is directly controlling here. 78 F.4th at 628. In *Parents 1*, parents challenged a school district's guidelines that permitted schools to develop gender support plans and, in certain circumstances, to withhold information about a student's gender identity from parents. The Fourth Circuit affirmed dismissal, holding that the parents' alleged injuries were too speculative to confer standing. *Id.* at 629–31.

The *Parents 1* court identified a four-step speculative chain a plaintiff would need to satisfy before suffering cognizable harm: "(1) their minor children must determine they identify as transgender or gender nonconforming, (2) their minor children must decide they want to

approach the school about a gender support plan, (3) the school must deem the parents unsupportive and (4) it must then decide to keep the information about their children from them." *Id.* at 631. The court held that because the parents did not allege that any of their children had gender support plans, had discussed gender identity with school officials, or were even considering gender transition, the risk of future injury was too attenuated to support standing. *Id.* at 629–31.

1. The Does fail to allege a cognizable injury-in-fact.

Application of *Parents 1* is straightforward—and fatal to the Does' standing. The complaint does not clear even the first step of the speculative chain. Mary answered a teacher's general classroom question about preferred names and gave a name other than her legal name. She did not ask to use male pronouns or give any indication that her requested name was linked to an interest in living as a boy. And even assuming Mary's response could be construed as gender-related, the complaint falls apart at the second step. Plaintiffs do not allege:

- That Mary ever approached the school about her gender identity;
- That Mary ever requested formal accommodations or a gender support plan;
- That any school official initiated a gender support plan for Mary;
- That a gender support plan was developed, documented, or implemented;
- That Mary ever accessed boys' restrooms or other facilities;
- That Mary ever participated or attempted to participate on a boys' athletic team;
- That Mary "consistently demonstrate[d] and identifie[d] with" a male gender identity within the meaning of the regulation; or
- That Mary expressed any intent to socially transition.

These omissions are dispositive. The *Parents 1* court was unambiguous: "The parents have not alleged that their children have gender support plans, are transgender or are even struggling with issues of gender identity." 78 F.4th at 626. The same is true here: the complaint is devoid of any allegation that Mary has a gender support plan or ever sought one from AACPS, is transgender, or is struggling with questions about her gender identity.

Regulation JQ-RA confirms why the missing plan is dispositive. Section D requires staff to work with the student *and parents* to develop a plan. (Yao Decl. ¶ 4, Ex. B.) The Does themselves acknowledged that requirement when they noted that no one had contacted them to develop one. First Am. Compl. ¶ 113. But there was no plan to develop because, on the facts as alleged, Mary never requested one or initiated any conversation about living as a different sex. The Does have not been subjected to the regulation's accommodations framework. Their broader hypothetical injuries—that Mary might access boys' facilities or participate in boys' athletics—are as speculative as those in *Parents 1*.

Standing must be established claim-by-claim and injury-by-injury. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Even if the Does had standing to challenge the name-and-pronoun provision of Regulation JQ-RA, that would not confer standing to challenge the gender-support-plan framework, facility access, athletic participation, or any other provision—each requires its own cognizable injury, and the Does have none. Moreover, the name issue itself has been fully resolved by the Consent Order, rendering any injury from that provision moot.

*Parents Protecting Our Children, UA v. Eau Claire Area School District*, 95 F.4th 501 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 14 (2024), further supports dismissal. The Seventh Circuit held that "expressions of worry and concern" that policies might one day affect a plaintiff's child do not establish injury-in-fact. *Id.* at 506. The Does similarly allege only that

Mary *might* access boys' facilities, *might* participate in boys' athletics, or *might* be harmed by future application of the policies. None of those possibilities is actual or certainly impending.

Stripped of speculation, the complaint identifies only two concrete injuries: school staff referred to Mary—at her request—by a name other than her legal name, and, under the facts as alleged, staff initially gave misleading responses when the Does asked. The Consent Order has fully resolved both, and Defendants have concretely shown that they will extend this relief for the duration of Mary's time at AACPS. There is no further relief this Court could award that Defendants have not already provided or stand ready to provide.

The Does' characterization of staff conduct as deliberate "concealment" or "deception" does not change the analysis. First, the complaint's own allegations show that the Does learned about the name usage through routine school communications—an email from a staff member and a field trip list. First Am. Compl. ¶¶ 78–80, 100–01. The information was not hidden; it came to light through ordinary channels. Second, even assuming staff gave inaccurate initial responses, that is evidence of how individual employees handled a situation—not evidence that they followed AACPS policies, let alone that Regulation JQ-RA authorizes or requires deception. To the contrary, the regulation mandates parental involvement. The remedy for a failure to follow the regulation is enforcement, not invalidation. Third, and dispositively, the Consent Order now prohibits concealment. Whatever injury the Does suffered has been remediated in full.

When a plaintiff has already received all the relief a court could provide, there is no live case or controversy. *See Already, LLC*, 568 U.S. at 91. A dispute over what name school staff used for one student—now resolved by court order—does not give the Does standing to challenge the entirety of AACPS's policy framework related to LGBTQ students.

2. <u>The existence of a policy does not establish standing to challenge it.</u>

The Consent Order already exempts the Does from the policies they challenge. But even setting that aside, merely being subject to a policy is not an injury. *Parents 1* is explicit on this point: "[J]ust because a policy or practice exists and is unconstitutional does not mean a particular plaintiff has been injured and has standing to challenge it." 78 F.4th at 633. A plaintiff must show it is "substantially likely she will actually be *injured* by the law, not simply that she must operate under it." *Id.* And even when a challenged law applies to the plaintiff, she must still demonstrate "a credible threat of government *action* that would harm them"—not merely that the law exists. *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)). The Does can show neither a credible threat nor a substantial likelihood of future injury.

3. <u>*Mirabelli* and other recent decisions are distinguishable.</u>

The Does invoke a wave of recent decisions addressing parental challenges to school policies on transgender students, but none are on point. Each of those cases involved policies that categorically excluded parents from their children's social transitions—a fundamentally different framework from the one at issue here.

*Mirabelli v. Bonta* is readily distinguishable on three grounds. 607 U.S. at 493–94. First, the parents in *Mirabelli* alleged that schools had actually developed gender support plans for their children, actively concealed those plans, and provided transition-related accommodations—all without parental knowledge. Here, the complaint alleges none of that. There is no gender support plan, no concealment of such a plan (because none existed), and no transition-related accommodations. The complaint alleges only a disagreement over what name staff used for Mary at her request—a dispute now resolved by court order. First Am. Compl. ¶¶ 86–88, 106. Second, the California policies at issue in *Mirabelli* affirmatively prohibited parental notification without the student's consent. 607 U.S. at 493. Regulation JQ-RA does the opposite: it *requires* parental

involvement. Section D of Regulation JQ-RA directs staff to "work with a student and the student's parent(s)/guardian(s) to develop an appropriate plan." (Yao Decl. ¶ 4, Ex. B.) A regulation that requires staff to work with parents is the antithesis of a statute that mandates parental exclusion. Third, *Mirabelli* was a preliminary per curiam order vacating a stay—not a merits decision on Article III standing. The Court did not announce a general rule of parental standing, and reading it to establish one would extend the decision far beyond its procedural posture and its facts.

The same distinction defeats the Does' reliance on *City of Huntington Beach v. Newsom*, No. 25-3826, 2026 WL 1785110 (9th Cir. June 18, 2026), and *Doe v. Pine Richland School District*, No. 24-3348, 2026 WL 1103489 (3d Cir. Apr. 23, 2026). In both cases, standing turned on whether the parents were directly subject to laws or policies that affirmatively prohibited parental notification without the student's consent. *City of Huntington Beach*, 2026 WL 1785110, at *2–3; *Doe*, 2026 WL 1103489, at *1, *3. And *Doe* confirms that such standing does not outlast the parent's exposure to the policy: the Third Circuit allowed only a damages claim for the period the child was enrolled and held that the parent lacked standing to seek prospective relief because, having withdrawn her child, she was "no longer the object of the District's Policy." *Doe*, 2026 WL 1103489, at *3. AACPS's regulation does not prohibit parental notification. It requires parental participation. That structural difference—a policy that includes parents versus one that excludes them—is dispositive.

In sum, every comparable case in which courts have found standing involved policies that *affirmatively excluded* parents and complaints alleging *ongoing* concealment of gender support plans or transition-related services. Here, the AACPS policies include parents, and the complaint alleges only a now-resolved disagreement over Mary's name.

For all of these reasons, the Does lack Article III standing to challenge Policy JQ, Regulation JQ-RA, or the 2019 Guidance Document. The complaint should be dismissed in its entirety for want of jurisdiction. *See Parents 1*, 78 F.4th at 636; *Parents Protecting Our Children*, 95 F.4th at 507. Because standing is a jurisdictional prerequisite, this Court need not—and should not—reach the merits. *Steel Co.*, 523 U.S. at 94 ("Without jurisdiction the court cannot proceed at all in any cause." (citation omitted)).

### C. The Does' Claims Are Not Ripe for Judicial Review

The Does' claims are also unripe. Ripeness requires the issues to be fit for judicial decision and that withholding review would cause hardship. *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)); *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019). The dispute at the heart of this case has been resolved. The Consent Order is in place. The 2019 Guidance Document has been withdrawn. And the Does' broader challenges to the gender-support-plan framework, facility access, and athletic participation depend entirely on contingent events that have not occurred and may never occur. *See Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 268 (4th Cir. 2013) ("[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation omitted)). Declining review imposes no hardship because the Consent Order addresses the only concrete injury alleged. The claims are therefore unripe and should be dismissed.

## II. THE DOES FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Even if this Court has subject matter jurisdiction, the complaint fails under Rule 12(b)(6). The Does' constitutional theories rest on a characterization of the AACPS policies that the policies' own text refutes. On a motion to dismiss, the Court accepts well-pleaded facts but need

not accept legal conclusions or allegations contradicted by documents attached to or incorporated into the complaint. *Iqbal*, 556 U.S. at 678–79; *Goines*, 822 F.3d at 166–67 (explaining that if a plaintiff "attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim" (citation omitted)). The Does attached the AACPS policies to their complaint and rely on them throughout—but the text of those policies contradicts their theory of the case. Because the policies on their face require parental involvement rather than exclude parents, neither the Free Exercise claim nor the substantive due process claim can survive.

### A. The Regulation Requires Parental Involvement—The Does' Characterization Is Belied by the Plain Text

The Does premise their claims on the assertion that the AACPS policies authorize schools to "socially transition" children without parental knowledge or consent. The regulation's plain text says the opposite. Section D of Regulation JQ-RA does not exclude parents—it requires their involvement: "School staff shall work with a student and the student's parent(s)/guardian(s) to develop an appropriate plan to accommodate and support the student and their gender identity, unless there is a genuine safety concern[.]" (Yao Decl. ¶ 4, Ex. B.) The August 2026 amendments reinforced that commitment: new Section D.4.d provides that "[n]othing in this regulation shall be construed to limit or otherwise interfere with parents'/guardians' rights under FERPA, including the right to inspect and review their student's complete education record." (*Id.* ¶ 12, Ex. B.) That provision is consistent with Policy JH, Regulation JH-RA, and the State Board's regulations implementing FERPA. (*Id.* ¶ 7, Exs. F, G.) And Policy KH confirms the same commitment to parental partnership, describing parents as "full partners in the decisions that affect children and families." (*Id.* ¶ 5, Ex. C.) Parental involvement is the default, the expectation, and the requirement.

A Section 1983 claim cannot succeed by attacking a policy that mandates the very thing the plaintiffs claim was denied. If individual staff members deviated from the regulation's parental-involvement requirement, that is not attributable to the policies themselves. *See Lytle v. Doyle*, 326 F.3d 463, 471–72 (4th Cir. 2003) (holding that an unauthorized memorandum followed by a single officer could not constitute official municipal policy for § 1983 purposes). The Does challenge the AACPS policies, but those policies require parental involvement.

**B. The Does' Free Exercise Claim Fails as a Matter of Law**

1. <u>The regulation is neutral and generally applicable.</u>

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. A neutral, generally applicable law need only satisfy rational-basis review. *Perry v. Marteney*, 172 F.4th 315, 321–22 (4th Cir. 2026), *petition for cert. filed*, No. 26-319 (Sept. 4, 2026). The AACPS policies meet both requirements. They are neutral because they contain no religious classification or targeting, and they are generally applicable because they apply the same nondiscrimination and accommodation framework to all students—without religious exemptions or selective enforcement. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–40, 542–46 (1993).

Rational-basis review is easily satisfied. The Does bear "the burden of negating any reasonably conceivable state of facts that could provide a rational basis" for the policies—a burden they cannot meet. *Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 749 (4th Cir. 2024) (quotation omitted). AACPS has a legitimate interest in ensuring that every student can attend school in a safe and supportive environment free from bullying, harassment, and discrimination. The policies advance that interest by protecting vulnerable students, providing individualized support plans with parental involvement, and treating all students with dignity.

The Supreme Court has repeatedly recognized that states have a compelling interest in "safeguarding the physical and psychological well-being of a minor." *New York v. Ferber*, 458 U.S. 747, 756–57 (1982) (quotation omitted); *see also Frudden v. Pilling*, 877 F.3d 821, 829 (9th Cir. 2017) (concluding that preventing bullying is a compelling interest). That interest is particularly acute for transgender students, who face documented risks of bullying, harassment, and suicide. *See* Glisten, *The 2025 National School Climate Survey: School Experiences of LGBTQ+ Youth in the U.S.* (2026), https://glisten.org/nscs2025/; Russell B. Toomey et al., *Transgender Adolescent Suicide Behavior*, 142 Pediatrics e20174218 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6317573/pdf/PEDS_20174218.pdf. The AACPS policies respond to those risks by creating a supportive environment while requiring parental involvement in accommodation decisions.[4] A policy that integrates student safety with parental participation easily satisfies rational-basis review.

2. *Mahmoud v. Taylor* is distinguishable on the Free Exercise claim.

*Mahmoud v. Taylor*, 606 U.S. 522 (2025), concerned a school board's decision to introduce LGBTQ+-inclusive storybooks into mandatory classroom instruction, direct teachers to "disrupt" children's thinking on sexuality and gender, correct students who disagreed, and rescind an existing opt-out policy. *Id.* at 529, 536–40. The Court held that the combination of mandatory instruction and the denial of opt-outs burdened parents' Free Exercise rights. *Id.* at 546–69. This case is different in every dimension. The AACPS policies do not mandate any

[4] This also echoes the expectations of the State's highest educational authority, as the Maryland State Department of Education (MSDE) has said, "Every school in Maryland has an important responsibility and legal obligation to develop and maintain safe and inclusive learning environments for all students. Students who feel unwelcome or unsafe cannot be fully present for learning." Maryland State Dep't of Educ., *Supporting LGBTQIA+ Students: Resources for Maryland Schools*, https://marylandpublicschools.org/about/pages/dsfss/lgbtqia+.aspx (last visited Sept. 30, 2026); *see also* Maryland State Dep't of Educ., *Safe and Supportive Schools for All Students: Creating Inclusive Spaces for LGBTQIA+ Youth* (Apr. 2026), https://marylandpublicschools.org/about/documents/dsfss/sssp/lgbtqia-guidance-a.pdf.

curriculum, any classroom instruction, or any exposure to content of any kind. They establish a procedural framework for addressing the individualized needs of students who request accommodation, and that framework requires parental involvement by its express terms. Nothing in *Mahmoud* suggests that schools violate the Free Exercise Clause simply by adopting policies that acknowledge that transgender students exist and may need support.

3. *Mirabelli* is distinguishable on the Free Exercise claim.

As explained above, *Mirabelli* is inapposite because the AACPS regulation is the opposite of the California policy at issue in that case—it does not authorize "unconsented facilitation" of anything. 607 U.S. at 496. The operative provision mandates that staff "shall work with" parents to develop any support plan. The amended regulation expressly addresses FERPA parental access rights. Parental involvement is the framework's default rule, not the exception.

The Does' own complaint confirms this distinction. It does not allege that a gender support plan was developed for Mary, that formal accommodations were provided under the regulation, or even that Mary approached any staff member about being transgender. It alleges only that individual staff members used the name she asked them to use. That is not "unconsented facilitation." The AACPS regulation is the opposite: it mandates parental involvement in developing any support plan and expressly preserves FERPA parental access rights. *Mirabelli* does not reach a policy that, by its terms, requires parental participation.

**C. The Substantive Due Process Claim Fails as a Matter of Law**

1. The regulation requires—not prohibits—parental involvement.

To state a substantive due process claim, the Does must show that the challenged policy actually restricts their parental rights, not merely that it makes parenting more difficult. *See*

*Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 353 (1st Cir. 2025), *cert. denied*, 146 S. Ct. 2571 (Apr. 20, 2026).

The Does characterize what occurred as deliberate concealment mandated by AACPS policy. The complaint's own allegations refute that characterization. The Does learned about the use of Mary's requested name through routine school communications—an email from a staff member and a field trip list. First Am. Compl. ¶¶ 78–80; 100–01. The complaint describes a disagreement between the Does and individual staff members about how to respond when Mary requested a name other than her legal name in answer to a routine classroom question. *Id.* ¶¶ 93, 106. That is not evidence that a *policy* mandates concealment.

This distinction is dispositive for purposes of the Does' facial challenge. A facial challenge tests the constitutionality of the policy as written, not the conduct of individual employees who may have deviated from it. *See Lytle*, 326 F.3d at 471 (distinguishing policy and practice for § 1983 purposes). If the Does' real grievance is with how staff handled Mary's situation, their remedy lies in enforcement of the regulation, not its invalidation. Striking down the policy would leave parents with fewer protections, not more.

Nor does the complaint allege that any formal accommodation, gender support plan, or transition-related service was ever provided to Mary, much less concealed from her parents. A disagreement over what name staff used for one student is not a constitutional violation—it is a parenting dispute already resolved in this case by Court Order.

2. <u>There is no constitutional right to affirmative notification.</u>

Even accepting the Does' framing, they have not identified a cognizable constitutional right to proactive notification. The Supreme Court has recognized parental rights in the "care, custody, and control" of children, but those cases addressed direct state interference with fundamental parenting decisions—such as compulsory schooling requirements or third-party

visitation orders—not a freestanding right to affirmative notification whenever a student communicates a personal preference to school staff. *Troxel*, 530 U.S. at 66; *accord Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

The Does' theory rests on the premise that AACPS policies violate the Constitution because they "do not require parental notification or consent" before staff use a student's requested name. But no court has held that the Constitution requires schools to notify parents whenever a student shares a name preference with a teacher or when a teacher respects that classroom request from a student.

The First Circuit's decision in *Foote v. Ludlow School Committee* is instructive. There, parents challenged a school protocol allowing students to use preferred names and pronouns without parental notification. The court held that such a nondisclosure protocol "lacks the 'coercive' or 'restraining' conduct that other courts have found to restrict parental rights." 128 F.4th at 353 (citation omitted). Because the Due Process Clause protects against government interference, not government inaction, it "'cannot fairly be extended to impose an affirmative obligation on the State'" to provide information to parents. *Id.* at 354 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). "A cognizable parental rights claim under the Due Process Clause . . . generally requires restraining conduct by the government, not mere nondisclosure of information." *Id.* (citing *Anspach ex rel. Anspach v. City of Phila.*, 503 F.3d 256, 266 (3d Cir. 2007)).

The critical distinction, which *Mirabelli* reinforces rather than undermines, is between *restraining* conduct—prohibiting parents from obtaining information—and the absence of an *affirmative* notification duty. California's policy in *Mirabelli* raised constitutional concerns because it *prohibited* schools from disclosing information to parents. That is restraining conduct.

A policy that declines to *require* proactive notification without blocking parental access does not cross that constitutional line.

The AACPS regulation presents an even stronger case for dismissal than the policy in *Foote* because the AACPS policies affirmatively require staff to "work with a student and the student's parent(s)/guardian(s) to develop an appropriate plan" and expressly preserve parental rights under FERPA. (Yao Decl. ¶ 4, Ex. B.) A substantive due process claim fails when the challenged regulation *requires* the very parental involvement the Does claim was denied.

Recognizing the right the Does assert would force schools to make fraught threshold judgments about which student statements trigger a notification duty, making it "difficult or impossible for any public school authority to administer school curricula responsive to the overall educational needs of the community and its children." *See Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003). When a student tells a teacher a different name preference and nothing more, the teacher has no reliable way to tell whether that choice reflects gender identity, a family nickname, a middle name, or simple preference—or whether it is a passing whim or a long-term change. A rule requiring notification of every name variation would force teachers to make precisely those judgments—an unworkable standard that would chill ordinary student-teacher interactions and impose significant administrative burdens on schools. Because the Does have not identified a cognizable constitutional right, they have failed to state a substantive due process claim.

3. <u>The safety exception does not save the Does' claim.</u>

The narrow "genuine safety concern" exception in Section D of JQ-RA does not itself create a cause of action, let alone save the Does' claim. The complaint does not allege that anyone invoked or even considered the exception for Mary, and a claim cannot rest on a hypothetical application never used against the plaintiff. *See Parents 1*, 78 F.4th at 629–31. To

the extent the Does challenge the exception on its face, that challenge fails for the reasons set out in Part II.D, *infra*.

**D. The Does' Facial Challenge to the Policies Fails**

To the extent the Does seek to invalidate the challenged policies on their face, they must show that "no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Facial challenges must fail where the law has a "plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 449 (2008) (quotation omitted). The Supreme Court cautions that "courts usually handle constitutional claims case by case, not en masse," because facial challenges rest on speculation about coverage and future enforcement and "threaten to short circuit the democratic process." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quotation omitted). A facial challenge asks this Court to do precisely what *Moody* warns against: to invalidate school district policies wholesale based on speculation about how those policies might be applied to students other than Mary, in circumstances the Does have not alleged and cannot predict.

The AACPS policies have a plainly legitimate sweep. They protect some of the most vulnerable students from bullying, harassment, and discrimination; create inclusive environments in which all students can learn and thrive; support the well-being of students struggling with questions of identity; require meaningful parental involvement in accommodation plans; and ensure compliance with federal law, including FERPA. These are among the most fundamental responsibilities of a public school system.

The safety exception in Section D of JQ-RA is part of that legitimate sweep, not a basis for facial invalidation. The exception protects children from abuse or abandonment—a compelling interest that *Mirabelli* itself recognized. 607 U.S. at 497 (noting that a policy that "preclud[es] gender-identity disclosure to parents who would engage in abuse" would serve a

state's compelling interest in safety). An exception designed to protect children from harm does not transform the regulation's default parental-involvement framework into an exclusion mechanism.

The Does' facial challenge to the 2019 Guidance Document fails for the additional reason that AACPS no longer applies it to any student. A facial challenge to a defunct policy presents no live controversy, and the Court should decline to issue an advisory opinion on it. For these reasons, the Does' facial challenge to the AACPS policies should be dismissed.

In sum, the Does' complaint fails to state a claim upon which relief can be granted. Their Free Exercise claim (Count I) fails because the regulation is neutral and generally applicable, requiring only rational basis review, which is easily satisfied. Their substantive due process claim (Count II) fails because the regulation does not authorize the harm they allege—it requires the very parental involvement they seek. Their facial challenge fails because the policies have a plainly legitimate sweep. And their reliance on *Mahmoud*, *Mirabelli*, and *Pine Richland* is unavailing because those cases involved policies that excluded parents by design, not policies that require parental involvement and were simply not followed. The complaint should becode dismissed in its entirety under Rule 12(b)(6).

## III. THE CLAIMS AGAINST DR. BEDELL AND THE INDIVIDUAL BOARD MEMBERS SHOULD BE DISMISSED

The Amended Complaint fails to state a claim against Dr. Bedell in his individual capacity. The three paragraphs that mention him allege only that he "advises the Board of Education on educational policies," manages AACPS's operations, "implements" AACPS policies, "provides leadership," and leads the AACPS central office. First Am. Compl. ¶¶ 13, 37, 118. Those allegations describe his position, not any personal conduct toward the Does. Nor does the Amended Complaint allege that Dr. Bedell directed, approved, or even knew of the staff

members' use of Mary's requested name or their alleged responses to the Does' inquiries. *See id.* ¶¶ 78–110. Its lone reference to him in connection with the Does is that school administrators contacted "the AACPS central office (led by Superintendent Bedell)," *id.* ¶ 118, but that concerns the office he heads, not any action he took.

Dr. Bedell cannot be held liable for staff conduct simply because he leads the school system. Section 1983 does not permit respondeat superior liability: "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 676. Nor is he liable as a supervisor, which requires showing that he knew of subordinate conduct posing "a pervasive and unreasonable risk" of constitutional injury and responded with "deliberate indifference"—facts the Amended Complaint does not allege. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Dr. Bedell is not even the staff members' employer: under Maryland law, the Board—not the Superintendent—appoints principals, teachers, and other certificated personnel on his nomination, sets their tenure and compensation, and may suspend or dismiss them. Md. Code Ann., Educ. §§ 6-201(b)(1), (f), 6-202(a)(1).

The official-capacity claims against Dr. Bedell fare no better, as they are only as strong as the Does' challenge to the AACPS policies themselves. The same is true of the individual Board members, who are sued only in their official capacities and appear in a single paragraph alleging only that they are "members of the Anne Arundel County Board of Education" and that "[t]he School Board is the public body that governs AACPS." First Am. Compl. ¶ 12. Although the Does removed the Board as a named defendant, individual Board members have no independent authority under Maryland law—their authority exists only when acting collectively as a body, and only when a majority of five members act. *See* Md. Code Ann., Educ. § 3-2A-06; Md. Code Regs. 13A.02.01.01. The claims against them are, at most, a challenge to Board Policy

JQ. For the reasons set out in Parts I and II, *supra*, the Does' challenge to those policies fails. Accordingly, the claims against Dr. Bedell, in both his individual and official capacities, and against the individual Board members should be dismissed.

## IV. THE CLAIMS AGAINST PRINCIPAL SMITH AND ASSISTANT PRINCIPAL CASOLO SHOULD BE DISMISSED

The allegations against Principal Smith and Assistant Principal Casolo likewise fail. The official-capacity claims fail because neither has authority to provide the relief the Does seek. The Does must show that relief against these particular defendants would redress their alleged injury. *See California v. Texas*, 593 U.S. 659, 672 (2021) (remedies "operate with respect to specific parties"); *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 903–04 (4th Cir. 2022). The Does ask the Court to declare the 2019 Guidance Document, Board Policy JQ, and Regulation JQ-RA unconstitutional and to enjoin their enforcement. First Am. Compl. ¶ 9. But Smith and Casolo are building-level administrators alleged only to implement those policies at Broadneck High School, *id.* ¶¶ 14–15, 37, with no authority to adopt, amend, or rescind district-wide policy. Relief directed at them could not invalidate the policies or change how they apply elsewhere in the school system. The only individualized relief they could provide—using Mary's legal name and keeping the Does informed—is already secured by the Consent Order, which binds them. The official-capacity claims therefore present nothing to redress and should be dismissed.

The individual-capacity claims fail because the Amended Complaint does not allege that Principal Smith or Assistant Principal Casolo personally engaged in the challenged conduct, nor does it state a claim for supervisory liability. Under *Shaw*, 13 F.3d at 799, a plaintiff must allege that the supervisor had knowledge of a "pervasive and unreasonable risk" of constitutional injury, that the supervisor responded with "deliberate indifference," and that there was an "affirmative causal link" to the plaintiff's injury. The Amended Complaint fails on all three. It

alleges only two isolated incidents with different teachers. It alleges that Smith and Casolo responded to the Does' complaints by directing them to appeal channels, which is not deliberate indifference. Finally, because the teachers' conduct occurred before the Does contacted any administrator, there can be no causal link between the administrators' actions and the alleged injury. The individual-capacity claims against Smith and Casolo should therefore be dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint in its entirety with prejudice.

Respectfully submitted,

By: */s/ Mary Rohmiller*

Mary Rohmiller (Bar No. 32576)
Alice W. Yao (Bar No. 32573)
Teresa Alutto-Schmidt (Bar No. 28367)
Susan V. Metcalfe*
POTOMAC LAW GROUP, PLLC
1717 Pennsylvania Avenue, NW, Suite 1025
Washington, DC 20006
Telephone: (202) 713-9380
mrohmiller@potomaclaw.com
ayao@potomaclaw.com
taluttoschmidt@potomaclaw.com
smetcalfe@potomaclaw.com

** Admitted pro hac vice*

*Counsel for Defendants*