**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JOHN and JANE DOE, Plaintiffs, v. MARK BEDELL, et al., Defendants. | ) | No. 1:26-cv-02690-RDB |

**<u>STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA</u>**

Under 28 U.S.C. § 517, the United States respectfully submits this Statement of Interest. Just before filing this brief, the United States filed its related lawsuit against the Board of Education of Anne Arundel County (the "Board") to stop Anne Arundel County Public Schools ("AACPS") from enforcing policies that facilitate the secret "transitioning" of children's "gender identity" at school without their parents' knowledge or consent (collectively, "Gender Policies"), in violation of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and the Protection of Pupil Rights Amendment ("PPRA"), 20 U.S.C. § 1232h,[1] In the current case, Defendants[2] filed a Motion to Dismiss ("Motion") Plaintiffs' First Amended Complaint ("FAC") for lack of subject matter jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(1) and failure to state a claim under Rule 12(b)(6). ECF No. 52. As explained below, the United States

[1] *See* Complaint at 1, *United States v. Bd. of Educ. of Anne Arundel Cnty*, No. 1:26-cv-4499 (D. Md. Oct. 27, 2026), ECF 1.

[2] In addition to AACPS's superintendent and other staff, the First Amended Complaint names individual Board members as defendants, but not the Board itself.

opposes Defendants' Motion to the extent it argues that Plaintiffs lack Article III standing. The Does have standing because AACPS's implementation of its Gender Policies inflicted concrete, particularized injuries by displacing the Does' authority to direct their daughter's upbringing, education, and care. Those same actions—central to the standing inquiry because they directly interfere with the Does' parental authority—also violate federal law, including FERPA and PPRA. The United States takes no position on Defendants' remaining arguments for dismissal.

## INTEREST OF THE UNITED STATES

The United States, through the Department of Justice, Civil Rights Division ("DOJ"), has a significant interest in the proper application of federal laws that protect and promote the interest of parents in the care, custody, and control of their children, which includes the fundamental right to direct the upbringing, education, and care of their children without undue governmental interference.

The Civil Rights Division furthers these interests by promoting the proper and consistent interpretation of FERPA and PPRA. As a condition of federal funding, FERPA requires school districts to give parents access to their children's education records, the opportunity to challenge the contents of their children's education records and correct, delete, or supplement them in line with the parents' wishes, as well as some control over the disclosure of personally identifiable information contained in their children's education records. Also, as a condition of federal funding, PPRA requires school districts to obtain written parental consent before requiring minor students to submit to any survey, analysis, or evaluation that reveals sensitive information concerning one or more of eight protected categories and, at a minimum, directly notify parents and offer them an opportunity to opt their children out of participating in any survey concerning the protected categories.

The United States has a substantial public policy interest in ensuring that the purposes for which FERPA and PPRA were enacted are honored. More broadly, the United States has a strong interest in ensuring that proper parties can sue to enforce parental rights and that improper parties cannot invoke the jurisdiction of the federal courts.

## BACKGROUND

Since at least 2019, AACPS has maintained Gender Policies that direct staff to gather sensitive information about students and their families without parental consent, help students socially transition to a different gender at school, and withhold this information from parents as confidential. Specifically, an AACPS guidance document, titled *Students and Gender Identity: Guidelines for Support* ("Guidelines"), says school staff "should" use "the name and pronoun that match the student's gender identity" and permits case-by-case staff decisions about whether and when to notify a student's parents about related issues. Guidelines at 5, ECF 15-5. AACPS Policy JQ, titled "Safe and Inclusive Environments for LGBTQ+ Students" and effective June 16, 2021, similarly guarantees students "the right . . . to be addressed by a name and pronoun that correspond to the student's gender identity" and "the right . . . to use school facilities that correspond with the gender identity the student consistently demonstrates." Pol'y JQ at 2, ECF 15-6. Regulation JQ-RA, effective September 6, 2022, and most recently revised August 18, 2026, implements Policy JQ. Regul. JQ-RA, ECF 52-5.

Pursuant to Regulation JQ-RA, AACPS directs school staff to "work with a student and the student's parent(s)/guardian(s) to develop an appropriate plan to accommodate and support the student and their gender identity, unless there is a genuine safety concern for the student's physical, emotional, or mental health safety as determined by the principal or the principal's designee." *Id.* at 2. AACPS also directs staff to honor a student's self-identified name and pronouns without

regard to the student's official school records, designates "[i]nformation about a student's gender identity" as "confidential medical information," and instructs staff not to disclose that information except where "legally required." *Id.* at 2-3. Given FERPA's clear prohibition on disclosing information contained in a student's education record to third parties—subject only to enumerated exceptions—the Regulation JQ-RA's creation of a separate category of "confidential" information is inconsistent with, and lacks any grounding in, FERPA. AACPS's August 18, 2026 amendment to Regulation JQ-RA, which merely added a perfunctory reference to FERPA, does not cure this flaw. Further, AACPS employees maintain records that reflect a student's self-identified gender information and report this "student gender information" to the Maryland State Department of Education. *Id.* at 2.

AACPS staff applied these policies to student Mary Doe, calling her by a name that did not match her legal name or sex—a *male* name.[3] When AACPS staff disclosed that erroneous male name to other parents, it revealed sensitive information about Mary Doe to third parties—the same information the staff had illegally obtained from Mary and then withheld from Mary's own parents. When Mary's parents tried to exercise their rights to their daughter's records, AACPS staff told them some records required an appointment and others a subpoena. On, July 9, 2026, Jane Doe filed a FERPA complaint and a PPRA complaint with the U.S. Department of Education ("ED") based on these facts.

The Does filed suit against Defendants to vindicate their constitutional rights under the Free Exercise Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment, First Am. Compl., ECF 13, and asked for preliminary relief that would enjoin

---

[3] "John Doe," "Jane Doe," and "Mary Doe" are pseudonyms, consistent with those used by the Does. *See* First Am. Compl. ¶ 1 n.1.

enforcement of the Gender Policies as to the Does, Am. Mot. for Prelim. Inj., ECF 15. Since then, the Does and Defendants (collectively, the "Parties") agreed, and on August 7, 2026, this Court ordered, *inter alia*, that Defendants (1) would not enforce the Gender Policies as to the Does; (2) would not refer to Mary Doe by any other name other than her legal name; (3) would provide the Does with timely notice of, and the opportunity to opt out of, any new or revised school policy or practice that relates to gender transition at school; and (4) would not withhold from John and Jane Doe information known to them relating to any future expression of interest in or efforts by Mary Doe to engage in gender transition. Consent Order for Prelim. Inj. 2, ECF 48.

On July 22, 2026, ED notified DOJ of its determination that AACPS is out of substantial compliance with the requirements of FERPA. On September 3, 2026, ED notified DOJ of its determination that AACPS is out of substantial compliance with the requirements of PPRA.[4]

On September 30, 2026, Defendants filed their Motion to Dismiss under Rules 12(b)(1) & (6). ECF 52. Therein, Defendants assert six different reasons for dismissal:

> (1) Plaintiffs' as-applied claims are moot; (2) Plaintiffs lack Article III standing to facially challenge the AACPS policies; (3) Plaintiffs' claims are not ripe for judicial review; (4) the First Amended Complaint fails to state a claim upon which relief can be granted; (5) the individual- and official-capacity claims against Superintendent Bedell and the official-capacity claims against the individual Board members should be dismissed; and (6) the claims against Principal Smith and Assistant Principal Casolo should be dismissed because the official-capacity claims present nothing to redress and the individual-capacity claims fail to state a claim.

On October 15, 2026, the Does filed their Memorandum in Opposition to the Motion ("Opposition"). ECF 55. The United States' brief only addresses the Motion's contentions regarding the Does' standing (*i.e.*, issue 2).

---

[4] On September 10, 2026, DOJ informed counsel for AACPS of ED's determinations. DOJ made significant prelitigation efforts to secure AACPS's voluntary compliance with FERPA and PPRA.

## LEGAL STANDARD

To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Put simply, "plaintiffs must show that they possess a personal stake in the dispute and are not mere bystanders." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025) (quotation marks omitted); *see Nat'l Park Serv. v. Nat'l Trust for Hist. Preservation in the United States*, No. 26A203 (Aug. 31, 2026), slip op. 2-4. Under "a facial challenge to subject matter jurisdiction, the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (internal quotation marks and citation omitted). "In that situation, the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

## ARGUMENT

Plaintiffs want to raise Mary Doe according to their religious beliefs, including that "God creates each person as male or female, that sex is based on biology rather than internal self-perception, and that sex cannot be altered." First Am. Compl. ¶ 6. The Does have standing to challenge AACPS's scheme that, by intent and design, displaces their authority as parents to direct Mary's upbringing, education, and care. Further, the United States asserts that AACPS violated, and its Gender Policies continue to violate, the Does' rights under federal law (*i.e.*, FERPA and PPRA).

### A. The Does Have Suffered Injuries Sufficient for Article III Standing.

As the Does explain in their Opposition, Defendants lied to the Does about socially transitioning their daughter. Mem. in Opp'n to Defs.' Mot. 1. But Defendants blatantly

mischaracterized the alleged facts that this court must accept as true: Pursuant to its Gender Policies, AACPS deliberately concealed information from the Does to facilitate Mary Doe's "gender transition". *See* First Am. Compl. ¶ 7. AACPS employees called Mary Doe by a male name and had one-one-one discussions with her about the use of male pronouns. First Am. Compl. ¶¶ 7, 87-89. When confronted by the Does about their use of a male name to refer to their daughter, *AACPS lied*. First Am. Compl. ¶ 7. AACPS employees also invoked the Gender Policies to justify their concealment efforts and to further withhold Mary Doe's education records from the Does. First Am. Compl. ¶¶ 125-26. At this stage of the litigation, the FAC, whose allegations must be accepted as true, sufficiently alleges concrete injuries to the Does' fundamental rights as Mary's parents.[5] Indeed, as the Does explained, the August 18, 2026 amendment to Regulation JQ-RA reflects that the "same fundamental" problems, including the "harm [and] threatened harm" to the Does, remain. Mem. in Opp'n to Defs.' Mot. 15 (citation omitted).

The Supreme Court has long recognized "that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion); *see id.* at 66-67 (collecting cases). That principle of parental control includes parents' right to "direct the upbringing" of their children, *Pierce v. Soc'y of the Sisters*, 268 U.S. 510, 534-35 (1925), and also bring them up within the bonds and bounds of their "religious beliefs," *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025).

More broadly, the Supreme Court has repeatedly held that the Constitution protects the traditional parent-child "relationship" itself, which is defined by the authority that a parent holds

[5] Defendants appear to raise a facial challenge to subject matter jurisdiction, and not a jurisdictional challenge, as they do not appear to contend that the FAC's "jurisdictional allegations . . . are not true." *Kerns*, 585 F.3d at 192 (internal quotation marks and citation omitted).

over his or her child, and the protective obligations that arise from that role. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978). By that light, the Court's cases affirm that parents have an interest in the "integrity" of the parent-child relationship, *Stanley v. Illinois*, 405 U.S. 645, 651 (1972), and accordingly, the parental powers that shape and define that relationship.

In this sense, the Supreme Court has treated parental rights as distinct within "our constitutional system," because they go beyond simply the ability to take a discrete set of actions, or merely make a fixed array of significant life decisions on behalf of one's child. *See Parham v. J.R.*, 442 U.S. 584, 602 (1979). A parent's "primary function and freedom" is to "prepar[e]" their child for the various "obligations" of life, not just to make a series of major choices for her. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). Because parental rights protect that parent-child relationship itself, they also encompass a parent's ongoing "authority" over their child, *Parham*, 442 U.S. at 602, and their "right [to] control" the day-to-day guidance and protection provided to one's children as they grow up, *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923); *see John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 640-41 (4th Cir. 2023) (Niemeyer, J., dissenting), cert. denied, 144 S. Ct. 2560 (2024). When a school district takes away or pares back that authority, it reaches into the home and alters a basic aspect of the traditional parent-child relationship. *See Quilloin*, 434 U.S. at 255. Such an "invasion" gives rise to a traditional Article III injury. *See Bennett v. Spear*, 520 U.S. 154, 167 (1997); *accord TransUnion*, 594 U.S. at 425.

*Mirabelli v. Bonta*, 607 U.S. 492 (2026), illustrates this point, and shows how the nature of parental rights shapes when parents have standing to defend them. There, California had a policy where public schools would not "tell[] [parents] about their children's efforts to engage in gender transitioning at school unless the children consent[ed] to parental notification." 607 U.S. at 493. A class of parents who "object[ed]" sued, and the Supreme Court held that those parents "very likely"

had standing, "because they are objects of the challenged exclusion policies." *Id.* at 498. Notably, the Court did not require the parental class to show that each of its members had a child with gender confusion; nor did it require they each establish their schools were actively (or imminently) participating in their child's social transition. Instead, the nature of the injury, shared across class members, was more foundational: The State had intervened in the parent-child relationship, and through its intervention, had restricted parents' "rights to direct the upbringing" of their children, and control "decisions regarding their children's mental health." *Id.* at 497. Nothing more than that severing of the "authority" that parents would otherwise possess was necessary. *See id.* at 498.

A parent thus may suffer an Article III injury when the government changes a fundamental aspect of the parent-child relationship—not just when a child acts against her parents' wishes. Parents suffer a concrete harm once a State engineers a scheme that "shut[s] [them] out of participation in decisions regarding" their child's upbringing, education, or care. *Id.* at 497. That restriction on parents' preexisting control alters the traditional day-to-day parenting relationship to which they are entitled, and it thereby inflicts a here-and-now injury for Article III.

As in *Mirabelli*, AACPS's Gender Policies violate parents' "right not to be shut out of participation in decisions regarding their children's mental health." 607 U.S. at 497 (citing *Parham*, 442 U.S. at 602). Relative to the Does, AACPS employees' actions in carrying out the Gender Policies confirm their effect. And the Does' facial challenge to the Gender Policies parallels the plaintiff parents' challenge of California's policies in *Mirabelli*. As "objects of the challenged exclusion policies," the Does have standing. *Cf. Mirabelli*, 607 U.S. at 498 (holding that objecting parents "very likely have standing").

Regardless of whether AACPS's scheme pursuant to the Gender Policies is ultimately constitutional, the Does, as objecting parents, have standing to challenge it. AACPS has negated

the Does' asserted right to direct Mary's upbringing, education, and care, and it has inserted a district-sanctioned means for the "unconsented facilitation of a child's gender transition," accomplished by a process of social "gender transition" the Does have asserted violate their firmly held religious beliefs. That usurpation effects a "[d]eparture[]" from a "preordained rule[]" structuring the parent-child relationship—that parents are the deciders when it comes to these vital questions. *See Bost v. Illinois State Board of Elections*, 607 U.S. 71, 78-79 (2026). Objecting parents who must operate under that revised dynamic suffer a "particularized and concrete harm" that is "in no sense 'common to all members of the public.'" *Id.* (quoting *Lance v. Coffman*, 549 U.S. 437, 440 (2007) (*per curiam*) (internal quotation marks omitted)). The Does have a cognizable here-and-now injury that itself is sufficient for standing.

**B. AACPS Violated, and its Gender Policies Continue to Violate, FERPA and PPRA.**

In addition to likely violating parents' constitutional rights, AACPS's Gender Policies—together with the August 18, 2026 amendment to Regulation JQ-RA—violate federal law, including FERPA and PPRA. "FERPA speaks to the Congressional elevation of the importance of parents being involved in their child's education." *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1211 (S.D. Cal. 2023). In fact, under FERPA, "[t]he privacy right of a child . . . takes second place to his or her parents' right to know." *Id.* at 1211-12. Parental rights under FERPA[6] include (i) the right to inspect and review a child's education records, which a school district cannot deny *or effectively prevent*, § 1232g(a)(1)(A); (ii) the right to an opportunity for a hearing to challenge the content of a child's education records to ensure that the records are not inaccurate, misleading, or otherwise in violation of the child's privacy rights, § 1232g(a)(2); (iii) the right to an opportunity to correct or delete any inaccurate, misleading, or otherwise inappropriate data and to insert into

[6] When a student turns 18 years old, or enters a postsecondary institution at any age, the rights under FERPA transfer from the parents to the student. 20 U.S.C. § 1232g(d).

the child's records a written explanation of the parents respecting the content of such records, § 1232g(a)(2); and (iv) subject to FERPA's definitions and enumerated exceptions, the right to provide or withhold written consent before a school permits the release of, releases, or provides access to a child's education records (or personally identifiable information except for "directory information"), § 1232g(b).

Parental rights under PPRA[7] include (i) the right to inspect all instructional materials § 1232h(a); (ii) the right to provide or withhold written consent before a school requires their child to submit to a survey, analysis, or evaluation that reveals information concerning one or more of the following categories ("Protected Categories"):

> (1) political affiliations or beliefs of the student or the student's parent;
> (2) mental or psychological problems of the student or the student's family;
> (3) sex behavior or attitudes;
> (4) illegal, anti-social, self-incriminating, or demeaning behavior;
> (5) critical appraisals of other individuals with whom respondents have close family relationships;
> (6) legally recognized privileged or analogous relationships, such as those of lawyers, physicians, and ministers;
> (7) religious practices, affiliations, or beliefs of the student or student's parent; or
> (8) income (other than that required by law to determine eligibility for participation in a program or for receiving financial assistance under such program)

§ 1232h(b); and (iii) the right to direct notification of and an opportunity to opt their children out of participating in any survey that reveals information in the Protected Categories, § 1232h(c)(2).

Defendants repeatedly (and wrongly) contend that AACPS's Gender Policies comply with "federal law." *See* Mem. in Supp. of Defs.' Mot. 10, n.3 (stating that AACPS's Gender Policies "have been in place for decades consistent with federal law"); 26 (stating that AACPS's Gender Policies "ensure compliance with federal law, including FERPA). And Defendants rely on this

---

[7] When a student turns 18 years old, or becomes an emancipated minor at any age, the rights under PPRA transfer from the parents to the student. 20 U.S.C. § 1232h(c)(5)(b).

erroneous assertion to challenge the Does' standing. *See* Mem. in Supp. of Defs.' Mot. 15 (stating incorrectly that Regulation JQ-RA "mandates parental involvement").

Quite the contrary, as DOJ has steadfastly informed AACPS and the Board, which share the same counsel as the individually named AACPS staff members and Board Defendants. Under its Gender Policies, AACPS ignores, denies, and effectively prevents parents from exercising their rights under FERPA and PPRA. Neither statute permits a school district—as AACPS does—to elevate its understanding of a child's needs for safety or privacy above the parents' understanding. Paradoxically, despite purporting to protect students, AACPS chooses to "cut out the primary protectors of children's best interests: their parents." *Mirabelli*, 607 U.S. at 496-97. Read plainly, the Gender Policies direct AACPS employees to have unauthorized conversations with a child about categories of information protected by PPRA in order to screen out parents (based on unsubstantiated concerns for safety, including "emotional" safety) who are most likely to exercise their rights under FERPA to challenge the "gender transition" process to which AACPS is committed.

Subjecting a child to a "gender transition" process, which bears on a child's physical, mental, and emotional health, carries enormous risks, because "children generally are less mature and responsible than adults, often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them, and are more vulnerable or susceptible to outside pressures than adults." *J.D.B. v. North Carolina*, 564 U.S. 261, 273 (2011) (cleaned up). FERPA and PPRA require schools to notify and involve parents based on the historical legal principle that "children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them". *See id.* And in the context of being questioned by adults about important topics, "a reasonable child . . . will sometimes feel pressured

to submit when a reasonable adult would feel free to go." *Id.* at 272 (noting how a reasonable child might feel when "subjected to police questioning").

For these reasons, ED determined that AACPS is out of substantial compliance with the requirements of both FERPA and PPRA, and DOJ's enforcement efforts are ongoing.

**CONCLUSION**

In light of the considerations above, including that AACPS's actions inflicted the concrete injury necessary for Article III standing and that the same conduct also violates FERPA and PPRA, Defendants' Motion to Dismiss should be denied to the extent it challenges the Does' standing.

DATED: October 27, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JEFFREY MORRISON
Deputy Assistant Attorney General

JOHN P. MERTENS
Acting Chief, Educational Opportunities Section

*/s/ Jordan K. Carpenter*
JORDAN K. CARPENTER (TN No. 035074)
Counsel
LADAWN BURNETT (MO No. 68881)
DEBJANI MAKEN (MS No. 09876)
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 514-3847
Email: jordan.carpenter2@usdoj.gov

**ATTORNEYS FOR**
**THE UNITED STATES OF AMERICA**